# 22-1658-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

ARON GOVIL,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

MATTHEW AARON FORD
ADAM C. FORD
STEPHEN R. HALPIN III
FORD O'BRIEN LANDY LLP
*Attorneys for Defendant-Appellant*
275 Madison Avenue, 24th Floor
New York, New York 10016
(212) 858-0040

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... iv

JURISDICTIONAL STATEMENT .............................................................. 1

QUESTIONS PRESENTED ......................................................................... 2

STATEMENT OF THE CASE ...................................................................... 3

    A.  Mr. Govil founds Cemtrex, holds high-level positions with the
        Company for several years, and later allegedly engages in
        conduct giving rise to the SEC's Complaint ............................................. 3

    B.  Mr. Govil negotiates a settlement with the Cemtrex Board in
        which he forfeits Company shares valued at $5,566,720 and
        agrees to enter a promissory note payable to the Company for
        an additional $1,533,280 ........................................................................ 5

    C.  The SEC files an enforcement action in the district court and
        Mr. Govil agrees to settle three of the four counts in the
        Complaint (Counts II, III, and IV) ........................................................ 8

    D.  The district court declines to credit Mr. Govil's relinquishment
        of Company stock and orders additional disgorgement of
        almost $6 million on Count I of the Complaint ................................... 9

    E.  Mr. Govil files a timely notice of appeal ............................................. 12

SUMMARY OF ARGUMENT ...................................................................... 12

STANDARD OF REVIEW .......................................................................... 15

ARGUMENT ............................................................................................... 16

I.    The progression of *Kokesh*, *Liu*, and the 2021 Amendments to the
    Exchange Act clarifies the type of disgorgement the SEC may seek,
    and district courts may award, under 15 U.S.C. § 78u ............................ 16

    A.  The remedy of "disgorgement" springs forth untethered from
        any statutory authority .......................................................................... 19

B.  Congress adds § 78u(d)(5) and *Liu* clarifies the scope of disgorgement permissible under that statute .......................................21

C.  The 2021 Amendments create a separate, distinct basis for disgorgement: § 78u(d)(3) & (d)(7) ............................................24

D.  The district court here failed to identify the source of authority for its disgorgement award in the amount of $5,801,720 ....................27

II.  The district court's award of disgorgement cannot be sustained under § 78u(d)(5) because: (1) there was no finding the award was "appropriate or necessary for the benefit of investors" and (2) it directs the funds received from the disgorgement award to be paid directly to the U.S. Treasury ...........................................................31

A.  To show that "equitable relief" is "appropriate or necessary for the benefit of investors" under § 78u(d)(5), the SEC must demonstrate that investors were harmed ...............................31

1.  The plain language of § 78u(d)(5) supports the interpretation that the SEC must show investors were harmed to seek disgorgement under the statute .................................32

2.  The structure of § 78u, amended post-*Liu*, supports the interpretation that SEC must show harm to investors in seeking disgorgement under § 78u(d)(5) ...............................34

B.  The SEC failed to demonstrate, and the district court failed to find, that investors were harmed as a result of Mr. Govil's alleged conduct ...........................................................36

C.  The district court's Final Judgment is inconsistent with *Liu* because it directs the funds received from the disgorgement award to be paid directly to the U.S. Treasury.....................................39

III.  The district court's disgorgement award cannot be sustained under the 2021 Amendments because requiring Mr. Govil to disgorge money directly to the U.S. Treasury without properly considering the value of the shares in Cemtrex he relinquished is inconsistent with principles of unjust enrichment ............................................44

**A.** **A permissible disgorgement award under the 2021 Amendments must be limited to the amount of the alleged wrongdoer's unjust enrichment** .............................................................45

**B.** **In this case, a permissible disgorgement award under the 2021 Amendments must account for the value of the shares Mr. Govil relinquished to Cemtrex** ...............................................47

**C.** **Recognizing that Mr. Govil's relinquishment of shares to Cemtrex satisfies the aims of disgorgement under the 2021 Amendments is consistent with other aspects of corporate law** ..........51

**CONCLUSION**...................................................................................54

**CERTIFICATE OF COMPLIANCE** .................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AHW Inv. P'ship v. Citigroup, Inc.*,
  806 F.3d 694 (2d Cir. 2015) ..................................................................52

*Asgrow Seed Co. v. Winterboer*,
  513 U.S. 179 (1995) ............................................................................32

*Bell v. Reno*,
  218 F.3d 86 (2d Cir. 2000) ..................................................................34

*Booking v. Gen. Star Mgmt. Co.*,
  254 F.3d 414 (2d Cir. 2001) ................................................................44

*Bruce Katz, M.D., P.C. v. Focus Forward, LLC*,
  22 F.4th 368 (2d Cir. 2022) ................................................................34

*F5 Cap. v. Pappas*,
  856 F.3d 61 (2d Cir. 2017) ..................................................................52

*Hu v. City of New York*,
  927 F.3d 81 (2d Cir. 2019) ..................................................................44

*In re Primedia, Inc. S'holders Litig.*,
  67 A.3d 455 (Del. Ch. 2013) ........................................................ 48–49

*Int'l Strategies Grp., Ltd. v. Ness*,
  645 F.3d 178 (2d Cir. 2011) ................................................................44

*Kokesh v. SEC*,
  137 S. Ct. 1635 (2017)........................................... 16, 17, 19, 22

*Kramer v. W. Pac. Indus., Inc.*,
  546 A.2d 348 (Del. 1988)....................................................................52

*Lacos Land Co. v. Arden Grp., Inc.*,
  517 A.2d 271 (Del. Ch. 1986) .............................................................47

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ..................................................................1

*Liu v. SEC*,
  140 S. Ct. 1936 (2020).............................................................. *passim*

iv

*Liu v. SEC*,
140 S. Ct. 451 (Mem.) (Nov. 1, 2019) .................................................17

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993) ............................................................................33

*Providence and Worcester Co. v. Baker*,
378 A.2d 121 (Del. 1977)....................................................................47

*Root v. Lake Shore & M.S. Ry. Co.*,
105 U.S. 189 (1881) ............................................................................39

*SEC v. AMX Int'l, Inc.*,
7 F.3d 71 (5th Cir. 1993) ....................................................................15

*SEC v. Blackburn*,
15 F.4th 676 (5th Cir. 2021)...............................................................41

*SEC v. Blavin*,
760 F.2d 706 (6th Cir. 1985) ..............................................................29

*SEC v. Bronson*,
No. 12-cv-6421, 2022 WL 1287937 (S.D.N.Y. Apr. 29, 2022) ..................41–42

*SEC v. Camarco*,
No. 19-1486, 2021 WL 5985058 (10th Cir. Dec. 16, 2021) (unpublished).. 33, 41

*SEC v. Cavanagh*,
445 F.3d 105 (2d Cir. 2006) ...............................................................22

*SEC v. Commonwealth Chem. Sec., Inc.*,
574 F.2d 90 (2d Cir. 1978) ......................................................... *passim*

*SEC v. Contorinis*,
743 F.3d 296 (2d Cir. 2014) ...............................................................22

*SEC v. Cope*,
No. 14CV7575 (DLC), 2021 WL 653088 (S.D.N.Y. Feb. 19, 2021),
*aff'd sub nom. SEC v. de Maison*, No. 18-2564, 2021 WL 5936385
(2d Cir. Dec. 16, 2021) (summary order)....................................... 18–19

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996) ..............................................................19

*SEC v. Fischbach Corp.*,
133 F.3d 170 (2d Cir. 1997) ......................................................... 23, 27

*SEC v. Gallison*,
    No. 15-cv-9456, 2022 WL 604258 (S.D.N.Y. 2022)...........................................45

*SEC v. Hallam*,
    42 F.4th 316 (5th Cir. 2022) ........................................................................ *passim*

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972) ...................................................................... 16, 21

*SEC v. Navellier & Assocs., Inc.*,
    No. 17-cv-11633, 2021 WL 5072975 (D. Mass. 2021),
    *appeal docketed*, No. 21-1857 (1st Cir. Oct. 28 2021) .......................................42

*SEC v. Palmisano*,
    135 F.3d 860 (2d Cir. 1998) ................................................................................45

*SEC v. Penn*,
    No. 14 Civ. 581, 2021 WL 1226978 (S.D.N.Y. Mar. 31, 2021)....... 11–12, 42, 43

*SEC v. Pentagon Cap. Mgmt. PLC*,
    725 F.3d 279 (2d Cir. 2013) ................................................................................15

*SEC v. Razmilovic*,
    738 F.3d 14 (2d Cir. 2013) .......................................................................... 15, 22

*SEC v. Sharp*,
    No. 21-cv-11276, 2022 WL 4085676 (D. Mass. Sept. 6, 2022) .........................45

*SEC v. Spartan Sec. Grp., Ltd.*,
    No. 19-cv-448, 2022 WL 3224008 (M.D. Fla. Aug. 10, 2022),
    *appeal docketed*, No. 22-13129 (11th Cir. Sept. 16, 2022).............. 42, 43, 45, 46

*SEC v. Texas Gulf Sulphur Co.*,
    446 F.2d 1301 (2d Cir. 1971) ............................................................... 16, 20, 46

*SEC v. Tome*,
    833 F.2d 1086 (2d Cir. 1987) ...................................................................... 28, 29

*SEC v. Westport Cap. Mkts., LLC*,
    547 F. Supp. 3d 157 (D. Conn. 2021) .................................................................42

*Tilghman v. Proctor*,
    125 U.S. 136 (1888) ............................................................................. 10, 39, 51

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004)..................................................................................52

*United States v. Peterson*,
   394 F.3d 98 (2d Cir. 2005) .......................................................... 34, 35

*United States v. RaPower-3, LLC*,
   960 F.3d 1240 (10th Cir. 2020) ..........................................................15

*United States v. Rosario*,
   7 F.4th 65 (2d Cir. 2021) ...................................................................32

*United States v. Weingarten*,
   632 F.3d 60 (2d Cir. 2011) .................................................................15

## Statutes and Other Authorities:

15 U.S.C. § 77t(d) ....................................................................................9

15 U.S.C. § 78aa .......................................................................................1

15 U.S.C. § 78u....................................................................................... *passim*

15 U.S.C. § 78u(d) ......................................................................... 25, 26, 27

15 U.S.C. § 78u(d)(3)................................................................ 9, 10, 26, 51

15 U.S.C. § 78u(d)(3)(A)(ii) ............................................................. *passim*

15 U.S.C. § 78u(d)(5) ......................................................................... *passim*

15 U.S.C. § 78u(d)(7)......................................................................... *passim*

15 U.S.C. § 78u(d)(8)..............................................................................26

15 U.S.C. § 78v(a) .....................................................................................1

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

17 C.F.R. § 240.10b-5..............................................................................20

8 Del. C. § 151(a) ...................................................................................47

116th Congress, 1st Session, H.R. 4344 (Sept. 17, 2019) ................. 24, 25

116th Congress, 1st Session, S.799 (Mar. 14, 2019) ........................ 24, 25

116th Congress, 2nd Session, H.R.6395 (Dec. 14, 2020) .......................25

Fed. R. Civ. P. 54(b) .................................................................................1

Sarbanes–Oxley Act of 2002, Pub. L. 107–204, 116 Stat 745,
(July 30, 2002) ..................................................................................... 21

Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (1934) .... 19, 20

11 William M. Fletcher, *Fletcher's Cyclopedia of the Law of Private
Corporations* (West 2013) .................................................................. 48

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*
69 (2012) ............................................................................................. 32

Ben Walther, *The Peril and Promise of Preferred Stock*,
39 Del. J. Corp. L. 161 (2014) .......................................................... 48

Black's Law Dictionary (11th ed. 2019) ............................................ 33, 46

Investopedia, *Alphabet's GOOG vs. GOOGL: What's the Difference?*
(updated Oct. 15, 2022) ...................................................................... 48

Paramount, *Shareholder Services, Alerts, & FAQS* (2022) .................. 48

Webster's Third New International Dictionary (1961) ......................... 32

William M. (Mac) Thornberry National Defense Authorization Act for
Fiscal Year 2021, Pub. L. 116–283, 134 Stat 3388 (Jan. 1 2021) ............ 18, 25

## JURISDICTIONAL STATEMENT

The district court possessed subject-matter jurisdiction over the underlying action because the claims brought by Plaintiff–Appellee the Securities and Exchange Commission ("the SEC" or "the Commission") arise under federal law. *See* A9 (citing 15 U.S.C. §§ 78v(a), 78aa); *see also* 28 U.S.C. § 1331. On July 5, 2022, that court issued a Final Judgment directing Defendant–Appellant Aron Govil to make payment to the SEC. SPA26. Additionally, the court instructed: "There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice." SPA28. Accordingly, this Court has subject-matter jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 322 (2d Cir. 2018) ("Title 28 U.S.C. § 1291 affords federal courts 'jurisdiction to hear timely appeals from final judgments or from partial final judgments entered pursuant to Fed. R. Civ. P. 54(b).'" (citation omitted)).

## QUESTIONS PRESENTED

1.      Was the district court's disgorgement award erroneous under 15 U.S.C. § 78u(d)(5) and *Liu v. SEC*, 140 S. Ct. 1936 (2020), where: (1) the SEC failed to demonstrate that the investors who participated in the offerings at issue were harmed as a result of Mr. Govil's alleged conduct and (2) the district court's Final Judgment directed the SEC to transmit the funds received pursuant to the award directly to the U.S. Treasury?

2.      Was the district court's disgorgement award in the amount of $5,801,720 erroneous under 15 U.S.C. § 78u(d)(3)(A)(ii) & (d)(7) where the court declined to consider evidence that Mr. Govil had already relinquished the value of his alleged unjust enrichment?

## STATEMENT OF THE CASE

**A.      Mr. Govil founds Cemtrex, holds high-level positions with the Company for several years, and later allegedly engages in conduct giving rise to the SEC's Complaint.**

Aron Govil is the founder and former controlling shareholder of Cemtrex Inc., a technology company incorporated in Delaware whose shares of common stock trade publicly on the NASDAQ under the ticker symbol "CETX." ("Cemtrex" or the "Company"). A9–10, A322.

After migrating to the United States from India in 1970, he obtained a bachelor's degree in Chemical Engineering from the City University of New York. A291. Mr. Govil then worked for several companies in the chemical engineering field until he founded Cemtrex in 1998. A10, A291. Over the years, Mr. Govil held various positions with the Company, including Chief Executive Officer and Chairman of the Board of Directors. A10.

Like many corporations, Cemtrex has issued various classes of stock to shareholders. More specifically, the Company has issued common stock as well as three separate classes of preferred shares: (1) Series A Preferred Shares; (2) Series C Preferred Shares; and (3) Series 1 Preferred Shares. A294–95. Both the Series A and C Preferred Shares do not trade publicly but provide significant voting rights to the holders relative to the voting power of the holders of the common stock. *Id.* The Series 1 Preferred Shares similarly provide greater voting power relative to the

common stock, but at a proportion lower than the Series A and C classes. *Id.* The Series 1 Preferred Shares also entitle the holder to a mandatory annual dividend of additional Series 1 Preferred Shares and have priority over the common stock in the event of a liquidation of the Company. *Id.* The Series 1 Preferred Shares trade publicly on the NASDAQ under the ticker symbol CETXP. *Id.*

In April 2016 and November 2017, Cemtrex sold "approximately $2.5 million in Cemtrex securities to an investor." A11. These offerings were in the form of "notes that could be converted into Cemtrex common shares six months after the notes were issued." A295. These convertible notes "were attractive to the institutional investors because they carried very high interest rates and an original issue discount, which increased the value of the note." A295–96. Moreover, if Cemtrex converted the notes after six months, the common shares issued to the investors would be at a significant discount to the market trading price. *Id.* The proceeds from the sale were deposited in a Company bank account. A11.

Separately, in or about December 2016, Cemtrex commenced a "registered subscription rights offering, which gave the purchaser a unit consisting of one share of Series 1 Preferred Stock and two Series 1 Warrants for a subscription price of $10 per unit." A11. As noted above, Series 1 Preferred Shares confer greater relative voting power than common shares and entitle the holder to an annual dividend of additional Series 1 Preferred Shares. The Company raised

"approximately $13,561,870" through the subscription rights offering, a portion of which was "used to pay the offering expenses, with the balance of approximately $11,750,000 deposited into one of Cemtrex's bank accounts." A11.

After the proceeds from the above offerings had been deposited into Cemtrex's bank accounts, Mr. Govil allegedly caused $7,300,000 to be transferred from the Company's accounts to bank accounts of another entity controlled by Mr. Govil. A11. In or about September 2020, Mr. Govil retired from Cemtrex to address certain health issues. A293–94.

### B. Mr. Govil negotiates a settlement with the Cemtrex Board in which he forfeits Company shares valued at $5,566,720 and agrees to enter a promissory note payable to the Company for an additional $1,533,280.

In February 2021, Mr. Govil approached Cemtrex and negotiated a settlement and release of any Company claims against Mr. Govil to account for the $7,100,000 he had allegedly caused to be transferred out of the Company bank accounts.[1] A175, A238. At the time, Cemtrex's Board of Directors consisted of Saagar Govil (Mr. Govil's son), Metodi Filipov, and Sunil Verma (chair of the Company's Audit Committee). *See* A239.

---

1. Although the SEC's Complaint alleges that the amount transferred was $7,300,000, Mr. Govil and Cemtrex agreed that the amount at issue was $7,100,000. *See* A175.

Prior to the settlement, Saagar Govil—who at the time was also Cemtrex's Chief Executive Officer—held a significant portion of the Company's Series C Preferred Shares, entitling him to substantial voting rights. *See* A149. Indeed, prior to the settlement, if for whatever reason Mr. Govil did not vote his shares, then his son Saagar could independently exercise control by virtue of the shares Saagar already owned. *See id.*

Mr. Verma, in his role as a director and the chair of Cemtrex's Audit Committee, negotiated the settlement directly with Mr. Govil on behalf of the Company, subject to the Board's ultimate approval. Mr. Verma and Mr. Govil exchanged multiple written proposals and counterproposals on February 25 and 26, 2021, via email. A240–43. Mr. Verma, acting on behalf of Cemtrex, insisted that as part of the settlement Mr. Govil relinquish all of his shares in the Company (he founded and built) at significantly lower per-share valuations than Mr. Govil offered. *Id.* It was also particularly important to Cemtrex's Board of Directors that Mr. Govil cede his voting shares. *See* A243.

Mr. Govil ultimately relented and transferred to the Company 1,000,000 shares of Series A Preferred Stock, 50,000 shares of Series C Preferred Stock, and 469,949 shares of Series 1 Preferred Stock, which Mr. Govil and the Company valued collectively at $5,566,720. A175–78. (At the time of the settlement, Cemtrex's Series 1 Preferred Shares (CETXP) traded publicly at $2.13 per share.

A273 n.4.) Mr. Govil also "forfeit[ed] all options to purchase shares of common[] stock" in Cemtrex. A175. In addition, Mr. Govil agreed to enter a promissory note payable to the Company for the remaining $1,533,280, bringing the total value of assets to be returned to the Company to $7,100,000, which equaled the amount that had been transferred out of the Company's bank account. *Id.* Cemtrex informed investors of the settlement through issuance of a Form 8-K dated February 26, 2021:

> On February 26, 2021, we entered into a Settlement and Mutual Release Agreement (the "Agreement") with Aron Govil, our former officer and director, concerning a dispute that has arisen between the parties related to, among other things, a series of transactions in 2017 and 2018 where funds were transferred from our bank account to the account of an entity that is controlled by Mr. Govil.

> The total amount of disputed transfers was approximately $7,100,000 and occurred during 2017 and 2018. The disputed transfers occurred in fiscal year 2017 in the amount of $5,600,000 and in fiscal year 2018 in the amount of $1,500,000. We did not find any other such transfers during this period or after that after looking at all our bank statements. These disputed transfers give rise to claims against Mr. Govil.

> In settlement, Mr. Govil is required to pay us consideration with a total value of $7,100,000 (the "Settlement Amount") within 10 business days of entering the Agreement. Part of the Settlement Amount will be paid in securities: Mr. Govil shall transfer to us the securities that he or his entities own in our company, including 1,000,000 shares of Series A Preferred Stock, 50,000 Shares of Series C Preferred Stock, 469,949 shares of Series 1 Preferred Stock, and forfeit all outstanding options to purchase shares of common[] stock (collectively, the "Securities"). The Securities being surrendered by Govil to us are collectively valued at the amount of $5,566,720.

> The balance of the Settlement Amount will be contained in a secured promissory note (the "Note") that Mr. Govil is required to issue to our company. The Note bears interest at 9% per annum and is secured by all of Mr. Govil's assets. Mr. Govil also agreed to sign an affidavit confessing judgment in the event of a default on the Note.

A322–23.

### C. The SEC files an enforcement action in the district court and Mr. Govil agrees to settle three of the four counts in the Complaint (Counts II, III, and IV).

On July 19, 2021, the SEC filed a four-count complaint against Mr. Govil in the United States District Court for the Southern District of New York. A6–21. The case was assigned to the Honorable J. Paul Oetken, U.S. District Judge. Two days after the Complaint was filed Mr. Govil consented to entry of judgment against him as to Counts II, III, and IV "without admitting or denying the allegations." A30.

Mr. Govil made several significant concessions as part of the settlement, including consent to the nonmonetary relief the SEC sought for all Counts and monetary relief for Counts II, III, and IV. More specifically, he agreed to: (i) a permanent injunction from violating provisions of the federal securities laws; (ii) a permanent bar from ever serving as an officer or director of any company that has registered securities with the SEC or is required to file reports with the SEC; (iii) a permanent bar from activities involving "penny stocks"; (iv) to pay disgorgement in the amount $626,782, plus prejudgment interest of $76,693.95 for Counts II, III,

and IV; and (iv) to pay a civil penalty of $620,000 in connection with those counts. A30–31.

On July 28, 2021, the district court entered judgment as to Counts II, III, and IV. SPA1–16 ("Partial Judgment"). Regarding Count I, the court ruled that, upon motion by the SEC, the court would "determine whether it is appropriate to order additional disgorgement of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty." SPA6. On January 28, 2022, after expedited discovery over the course of a few months, the SEC moved for additional disgorgement of $7,335,000, prejudgment interest thereon of $1,320,654.29, and a penalty of $16,056,870 as relief for Count I in the Complaint. A45–65.

**D. The district court declines to credit Mr. Govil's relinquishment of Company stock and orders additional disgorgement of almost $6 million on Count I of the Complaint.**

On May 24, 2022, the district court issued a nine-page Opinion and Order granting in part and denying in part the SEC's motion for additional disgorgement. SPA17–25 ("Opinion"). The Opinion begins with a short "Factual Background," which notes that "the sole remaining issue before the Court is the monetary relief, if any on Count I." SPA17. After summarizing the allegations in the Complaint relevant to Count I, the court explains: "Based on the terms of the Settlement

9

Agreement [between Mr. Govil and Cemtrex], Govil agreed to pay Cemtrex $7.1 million in the form of (1) Cemtrex stock owned by Govil and valued at $5,566,720 and (2) a promissory note in the amount of $1,533,280 issued by Govil payable with interest within two years (i.e., by February 26, 2023)." SPA18. "In exchange, Cemtrex released the company's claims against Govil." *Id.*

Following the "Factual Background," the district court addresses the SEC's request for additional disgorgement of $7,335,000 from Mr. Govil. *See* SPA18–22. Nowhere in the Opinion does the district court cite the purported statutory or other authority for its decision to award additional disgorgement for Count I. But the court observes that "[d]isgorgement is designed to 'strip wrongdoers of their ill-gotten gains,' but it is not meant to be used as a 'punitive sanction.'" SPA18 (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020)). In that vein, the court notes that if Cemtrex is the "victim" of the alleged conduct in Count I, "then the Settlement Agreement would have properly 'pa[id] . . . a fair compensation to the person wronged,' *Tilghman v. Proctor*, 125 U.S. 136, 146 (1888), and requiring additional disgorgement would then serve as an improper punitive measure." SPA20 (alteration in original).

The district court does not affirmatively state in the Opinion whether Cemtrex was the victim—or a victim—of Mr. Govil's alleged misconduct, but does venture that Cemtrex's "investors are the real victims." SPA21. As to Mr.

Govil's Settlement Agreement with the Company, the court found that after Mr. Govil relinquished his shares, "Govil's son obtained sole voting control over the company, Govil was released from liability, and Cemtrex shareholders received nothing. Only Govil and his son benefitted from Govil's surrender of stock, a result that runs counter to the purposes of disgorgement." *Id.* But later in its discussion of additional civil penalties on Count I, the court acknowledges "that though there was a risk of significant loss, the investors *may not have been financially harmed as a result of Govil's misconduct*." SPA24 (emphasis added).

Regarding the promissory note payable to Cemtrex that Mr. Govil entered, the district court concluded: "As the funds from the promissory note will presumably be placed in the company's account and used for corporate expenses, the original promise to the purchasers of the offerings will, in fact, be realized." SPA21. The court thus credited the promissory note against the $7,335,000 sought by the SEC, bringing the total to $5,801,720. *Id.*

The district court also observed: "The SEC has represented that it is feasible to identify the victims of the fraud. However, if it later determines that distribution to investors is infeasible, it must update the Court to permit consideration of whether directing such proceeds to the Treasury is permissible." SPA22 (citing *SEC v. Penn*, No. 14 Civ. 581, 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31,

2021)). As of filing of this brief, nothing in the record reflects efforts by the SEC to identify alleged victims of the alleged fraud.

Finally, the district court, having concluded that Mr. Govil should disgorge an additional $5,801,720 as relief for Count I—less than the $7,335,000 requested by the SEC—instructed the SEC to "submit a revised prejudgment interest calculation based on the revised disgorgement amount and a proposed final judgment." SPA24–25 The SEC submitted both on June 16, 2022. A359–63.

### E.     Mr. Govil files a timely notice of appeal.

On July 5, 2022, the district court entered final judgment ("Final Judgment"), ordering Mr. Govil to pay a total of $7,467,858.87 to the SEC, comprised of: (1) $5,801,720 in disgorgement on Count I; (2) prejudgment interest thereon of $1,044,589.87; and (3) a civil penalty of $621,549. SPA26–28. Notably, the Final Judgment further directed: "The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury." SPA27. Mr. Govil timely noticed this appeal on August 1, 2022. A364–65.

### SUMMARY OF ARGUMENT

Following the 2021 National Defense Authorization Act (NDAA), which included amendments to Section 21(d) of the Exchange Act (codified at 15 U.S.C. § 78u), there are now two distinct statutory bases for disgorgement awards in SEC enforcement actions: 15 U.S.C. § 78u(d)(5) (enacted in 2002) and 15 U.S.C.

§ 78u(d)(3)(A)(ii) & (d)(7) (referred to herein as the "2021 Amendments"). *See* SPA29–38 (15 U.S.C.A. § 78u (West)).

Section 78u(d)(5) allows the SEC to seek and district courts to award "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Prior to the 2021 Amendments, § 78u(d)(5) was understood to be the sole statutory authority for disgorgement awards in SEC enforcement actions and was interpreted by the Supreme Court in 2020, which held "[a] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *Liu v. SEC*, 140 S. Ct. 1936, 1937 (2020). *Liu* additionally expressed concern that "courts have occasionally awarded disgorgement in . . . ways that test the bounds of equity practice," including "by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims." *Id.* at 1946.

By contrast, as of January 1, 2021, § 78u(d)(3)(A)(ii) enables district courts to "require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of the violation." 15 U.S.C. § 78u(d)(3)(A)(ii). And § 78u(d)(7) permits the SEC to seek and federal courts to order "disgorgement."

Here, although the 2021 Amendments were in effect, providing a separate and distinct statutory basis for a possible disgorgement award, the district court did

not identify its source of authority when awarding disgorgement against Mr. Govil in the amount of $5,801,720. In some respects, the court's Opinion signaled that it may have intended to rely on § 78u(d)(5) by inquiring as to the "real victims" of Govil's alleged misconduct and directing the SEC to "update the Court" if it "determines that distribution to investors is infeasible." SPA21–22.

But its disgorgement award cannot be sustained under § 78u(d)(5) because the district court (1) did not find that the investors that participated in the offerings at issue were harmed, thereby appropriate "victims" under § 78(d)(5), and (2) when faced with evidence that investors may have benefited from their investments, the court expressly acknowledged "the investors *may not have been financially harmed* as a result of Govil's misconduct." SPA24 (emphasis added). Further, the district court's Final Judgment directed the SEC to send the disgorged funds to the United State Treasury, SPA27, a practice *Liu* has suggested is "in considerable tension with [the] equity practices" that permit a § 78u(d)(5) disgorgement award. 140 S. Ct. at 1946. The district court's orders simply do not square with the "equitable relief" contemplated by *Liu* as permissible under § 78u(d)(5) and should be vacated and remanded on that basis alone.

Additionally, should this Court reach the issue, the disgorgement award cannot be upheld under the 2021 Amendments because the district court's failure to consider Mr. Govil's relinquishment of all securities he owned in Cemtrex

disregards a required finding under that statutory authority: that Mr. Govil retained his unjust enrichment from the alleged violations at issue.

The disgorgement award cannot be sustained under any available statutory basis, and Mr. Govil respectfully requests that the Court vacate the district court's decision awarding disgorgement on Count I of the Complaint and remand with instructions.

## STANDARD OF REVIEW

A district court's legal conclusions, including its interpretations of federal statutes, are reviewed de novo. *United States v. Weingarten*, 632 F.3d 60, 63 (2d Cir. 2011). A district court's disgorgement award is generally reviewed for abuse of discretion. *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013). But an abuse of discretion may consist of an erroneous view of the law, a clearly erroneous assessment of the facts, or a decision that cannot be located within the range of permissible decisions. *SEC v. Razmilovic*, 738 F.3d 14, 25 (2d Cir. 2013).

Other courts of appeals have applied a mixed standard of review to a district court order requiring disgorgement in a proceeding initiated by the SEC. Specifically, de novo review has been applied to a district court's "method" of determining a disgorgement award and to a district court's understanding of its authority to award disgorgement. *See United States v. RaPower-3, LLC*, 960 F.3d 1240, 1251 (10th Cir. 2020); *SEC v. AMX Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993).

**ARGUMENT**

I. **The progression of *Kokesh*, *Liu*, and the 2021 Amendments to the Exchange Act clarifies the type of disgorgement the SEC may seek, and district courts may award, under 15 U.S.C. § 78u.**

Recent developments on both sides of First Street NE have wrought significant changes to the authority of the district courts to award "disgorgement" as relief for violations of the federal securities laws. The upshot is that there are now two distinct statutory bases under which federal courts may award what has come to be understood as "disgorgement": (1) § 78u(d)(5), which the Supreme Court has explained permits a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims; and (2) § 78u(d)(3)(A)(ii) & 78u(d)(7) (referred to herein as the "2021 Amendments"), which permit disgorgement of a wrongdoer's "unjust enrichment." As explained in Parts II and III, *infra*, the district court's award of disgorgement against Mr. Govil cannot be sustained under either.

Over the last half-century, this Court—and many other courts of appeals—recognized the absence of specific statutory authority, but concluded that a district court could nonetheless order securities violators to "disgorge" ill-gotten gains as an exercise of the court's "general equity power." *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1307–08 (2d Cir. 1971); *see also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (describing lack of statutory authority).

Against that backdrop, in 2002 Congress amended the Exchange Act to provide expressly that "the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).

But § 78u(d)(5) initially gained little traction as a vehicle for requiring a securities violator to disgorge his ill-gotten gains. Many courts declined to invoke the statute, or otherwise continued to cite their purported "general equity power" to grant disgorgement; that is, until the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). The Court in *Kokesh* cast a shadow over this well-entrenched position—that disgorgement was an appropriate exercise of lower federal courts' general equity power—observing in a footnote: "Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context." *Id.* at 1642 n.3.

Congress did not sit idly by. In short order following *Kokesh*, multiple bills were drafted and introduced to clarify the type of "disgorgement" the SEC could seek and courts could award. As these bills wound their ways through the halls of the Capitol, the Supreme Court agreed to hear *Liu v. SEC*, 140 S. Ct. 451 (Nov. 1, 2019) (granting cert.), a case in which the SEC sought to rely on § 78u(d)(5) as a basis for seeking disgorgement. In *Liu*, the Court held "that a disgorgement award

that does not exceed a wrongdoer's net profits and *is awarded for victims* is equitable relief permissible under § 78u(d)(5)." *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020) (emphasis added). Notably, *Liu* expressed concern regarding district courts' practice of ordering disgorgement proceeds to be deposited into the U.S. Treasury, considering "such incarnations" of disgorgement to be "in considerable tension with equity practices." *Id*. at 1946.

In the months after *Liu*, Congress coalesced around a set of further amendments regarding disgorgement in SEC enforcement actions. The 2021 Amendments, included in the National Defense Authorization Act of 2021, codified a separate statutory basis for disgorgement—§ 78u(d)(3)(A)(ii) & (7)—tied to the common-law concept of "unjust enrichment."[2]

But since *Liu* and the 2021 Amendments, lower courts—including the district court here—have continued to grant disgorgement without clearly specifying the underlying authority for such an award. *See, e.g.*, SPA17–25; Final Judgment; *SEC v. Cope*, No. 14CV7575 (DLC), 2021 WL 653088, at *2 (S.D.N.Y.

---

2. On December 23, 2020, then-President Trump vetoed the NDAA. *See* Congress.gov, H.R.6395 – William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, https://www.congress.gov/bill/116th-congress/house-bill/6395/actions (last accessed Nov. 11, 2022). The bill became law on January 1, 2021, after both the House and Senate overrode the veto. *Id.* The 2021 Amendments thus took effect prior to the SEC's filing of its Complaint against Mr. Govil in July 2021.

Feb. 19, 2021) ("While *Liu* limited to a certain extent the scope of the disgorgement remedy, a district court retains 'broad equitable power to fashion appropriate remedies' for federal securities law violations, including imposing disgorgement." (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996))), *aff'd sub nom. SEC v. de Maison*, No. 18-2564, 2021 WL 5936385 (2d Cir. Dec. 16, 2021) (summary order).

This Court has cited *Liu* in only a handful of cases and has not yet analyzed the effects of the 2021 Amendments on federal courts' authority to award disgorgement in SEC enforcement actions. This appeal presents an opportunity for the Court to provide guidance in the wake of *Kokesh*, *Liu*, and the 2021 Amendments.

A. **The remedy of "disgorgement" springs forth untethered from any statutory authority.**

The original Exchange Act contained "little remedial detail." *See SEC v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022) (citing Securities Exchange Act of 1934, Pub. L. No. 73-291, tit. I, §§ 1–34, 48 Stat. 881, 881–905 (1934)). It spoke only generally of the courts' power to enjoin "acts or practices which constitute or will constitute a violation of the [Exchange Act]," "gave certain courts 'exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce [the Act]," and "explained that '[t]he rights and remedies [it created] shall be in

addition to . . . all other rights and remedies . . . at law or in equity.'" *Id*. (citations omitted).

Decades later, this Court began developing jurisprudence concerning remedial awards in SEC enforcement actions. *See Texas Gulf Sulphur Co.*, 446 F.2d at 1301; *see also Hallam*, 42 F.4th at 327 (recognizing the Second Circuit as "the first federal appeals court to interpret the Exchange Act to permit recovery of 'restitution of profits'"). In *Texas Gulf Sulphur*, this Court acknowledged the absence of "specific statutory authority" for a restitution remedy but found it acceptable pursuant to the court's "general equity power" under the Exchange Act. *Texas Gulf Sulphur Co.*, 446 F.2d at 1307–08.

Specifically, this Court in *Texas Gulf Sulphur* held that the SEC is not limited to injunctive relief but may also seek "remedial relief" to effectuate the purpose of the Exchange Act, as long as such relief is "not a penalty assessment." 446 F.2d at 1308. The Court reasoned: "It would severely defeat the purposes of the Act if a violator of Rule 10b-5 were allowed to retain the profits from his violation." *Id*. Based on these equitable and "remedial" principles, this Court upheld an award requiring the certain officers, directors, and employees to pay to the company "the profits they had derived" from insider trading. *Id*. at 1307–08.

The following year, this Court introduced the term "disgorge" to the securities lexicon when it referred to a district court's order requiring the

defendants to "disgorge all the proceeds, profits and income received in connection with the public offering of [common stock]." *See Hallam*, 42 F.4th at 328 (citing *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1103, and referring to its decision as "the first time in appellate securities law" where the term "disgorge" was used to "refer to the repayment of profits"). The rationale underlying such an award was clear: disgorgement's "primary purpose" was to serve as "a method of forcing a defendant to give up the amount by which he was unjustly enriched." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978).

### B. Congress adds § 78u(d)(5) and *Liu* clarifies the scope of disgorgement permissible under that statute.

Congress added § 78u(d)(5) as part of the Sarbanes–Oxley Act of 2002, Pub. L. 107–204, July 30, 2002, 116 Stat 745. The provision provides:

**(5) Equitable relief**

In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, *any equitable relief that may be appropriate or necessary for the benefit of investors*.

(emphasis added).

But even after § 78u(d)(5) was enacted in 2002, and despite emphasizing disgorgement's desired "effect of deterring subsequent fraud," this Court continued to refer to district courts' "broad equitable power to fashion appropriate remedies," including disgorgement as a method of forcing defendants to give up the amount

by which they were "unjustly enriched." *See SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006); *see also Razmilovic*, 738 F.3d at 31, 36 (referring to the district court's "broad equitable power to fashion appropriate remedies" and highlighting disgorgement's primary purpose of depriving ill-gotten gains "thereby effectuating the deterrence objectives of those laws").

In *SEC v. Contorinis*, this Court emphasized that, "[b]ecause disgorgement's underlying purpose is to make lawbreaking unprofitable for the law-breaker, *it satisfies its design when the lawbreaker returns the fruits of his misdeed*s, regardless of any other ends it may or may not accomplish." 743 F.3d 296, 301 (2d Cir. 2014) (emphasis added). Notably, none of these decisions cited or even referenced § 78u(d)(5), implying that this Court understood that courts' general equity powers to award disgorgement for the "primary purpose of . . . forcing a defendant to give up the amount by which he was unjustly enriched" remained undisturbed by the enactment of § 78u(d)(5). *See Commonwealth Chem.*, 574 F.2d at 102.

Then, in 2017 a unanimous Supreme Court carefully noted that it was not opining on "whether courts possess authority to order disgorgement in SEC enforcement proceedings," *Kokesh*, 137 S. Ct. at 1645 n.3, a question previously considered beyond dispute in this Circuit. Two years later, the Court agreed to take

up *Liu* and stated that the question was "now squarely before [it]." *Liu*, 140 S. Ct. at 1941.

After surveying several "longstanding equitable principles," the Court in *Liu* concluded that the SEC could seek disgorgement under § 78u(d)(5) but that "Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing." *Id.* at 1946. Thus, after decades of this Court's jurisprudence emphasizing disgorgement's primary purpose as a method of "forcing a defendant to give up the amount by which he was unjustly enriched" and regarding compensating victims for their losses as a "distinctly secondary goal," *see Commonwealth Chem.*, 574 F.2d at 102; *see also SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997), *Liu* threatened to substantially limit the SEC's ability to recover disgorgement for these purposes.

The Court in *Liu* also noted that a disgorgement award "ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims" may exceed "the bounds of equity practice." 140 S. Ct. at 1946. Put differently, "[t]he equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to *wronged investors* for their benefit." *Id.* at 1948 (emphasis added).

Focusing on the statutory phrase "appropriate or necessary for the benefit of investors," the Court explained: "[T]he SEC's equitable, profits-based remedy

must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless the latter part of § 78u(d)(5)." *Id.* Disgorgement under § 78u(d)(5) must be "awarded for victims." *Id.* at 1940.

### C.    The 2021 Amendments create a separate, distinct basis for disgorgement: § 78u(d)(3) & (d)(7).

In apparent response to *Kokesh* and before the Supreme Court had granted certiorari in *Liu*, legislators introduced bills in Congress seeking to clarify that the SEC may seek and courts may award "disgorgement of any unjust enrichment." *See* 116th Congress, 1st Session, S.799 (Mar. 14, 2019); 116th Congress, 1st Session, H.R. 4344 (Sept. 17, 2019).

On March 14, 2019, a bill was introduced in the Senate designed to "amend the Securities Exchange Act of 1934 to clarify that the Securities and Exchange Commission may seek *disgorgement and restitution* as a result of a violation of the securities laws, to establish the statute of limitations for *disgorgement and equitable actions* brought by the Commission, and for other purposes." 116th CONGRESS, 1st Session, S.799 (Mar. 14, 2019) (emphases added). The proposed bill recommended adding the following provision: "In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, *disgorgement of any*

*unjust enrichment* that a person obtained as a result of a violation of that provision." *Id*. (emphasis added).

On September 17, 2019, a similar bill was introduced in the House designed to "amend the Securities Exchange Act of 1934 to allow the Securities and Exchange Commission to seek and Federal courts to grant *disgorgement of unjust enrichment*, and for other purposes." 116th CONGRESS, 1st Session, H.R. 4344 (Sept. 17, 2019) (emphasis added). It recommended that Section 21(d) of the Exchange Act (15 U.S.C. § 78u(d)) be amended to add a paragraph (7) titled "additional relief" including "*Disgorgement in the amount of any unjust enrichment* obtained as a result of act or practice with respect to which the Commission is bringing such an action or proceeding." *Id*. (emphasis added).

These two predecessor bills ultimately did not proceed in the Senate. But a December 14, 2020 version of the draft National Defense Authorization Act (NDAA) referred to a Section 6501 concerning "Investigation and prosecution of offenses for violations of the securities laws." 116th CONGRESS, 2nd Session, H.R. 6395 (Dec. 14, 2020). That section ultimately made it into the final text of the NDAA, which became effective January 1, 2021. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116–283, 134 Stat 3388 (January 1, 2021). Section 6501 of the NDAA amended Section 21 of the Exchange Act (codified at 15 U.S.C. § 78u) (accordingly,

references to the NDAA's amendments to Section 21(d) of the Exchange Act also refer to those corresponding amendments to § 78u(d)). As alluded to above, the NDAA includes three significant amendments that are relevant for present purposes.

*First*, Congress expanded § 78u(d)(3), changing the title from "Money penalties in civil actions" to "Civil money penalties *and authority to seek disgorgement*" and adding subsection (A)(iii) enabling courts to "require disgorgement under paragraph (7) *of any unjust enrichment* by the person who received such unjust enrichment as a result of the violation." 15 U.S.C. § 78u(d)(3) (emphasis added) (eff. Jan. 1, 2021) and 15 U.S.C. § 78u(d)(3) (emphasis added) (eff. Dec. 18, 2015 to Dec. 31, 2020). *Second*, Congress added § 78u(d)(7), titled "Disgorgement," providing: "In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). *Finally*, Congress added § 78u(d)(8), establishing distinct limitations periods for (A) "Disgorgement" and (B) "Equitable remedies." 15 U.S.C. § 78u(d)(8).

Section (d)(8) confirms, by imposing two separate limitations periods, that paragraph (7) "disgorgement" and "equitable remedies" (presumably under section (d)(5)) are separate and distinct remedies. Specifically, as one avenue for relief in SEC enforcement actions, the SEC may seek and courts may award "equitable

relief" under section (d)(5), which is "appropriate and necessary for the benefit of investors" under principles that are consistent with *Liu*. Another avenue, made clear by the 2021 Amendments, permits the SEC to seek and courts to award "disgorgement . . . of any unjust enrichment." Neither avenue contemplates resort to a court's purported *inherent* equitable authority to order disgorgement for violations of the securities laws.

### D. The district court here failed to identify the source of authority for its disgorgement award in the amount of $5,801,720.

The 2021 Amendments took effect on January 1, 2021, six months before the SEC's Complaint in this action was filed on July 19, 2021. Nevertheless, neither the July 2022 Final Judgment nor the May 2022 Opinion providing the district court's reasoning for its disgorgement award identified the court's source of authority for the award, or even referenced any provision of § 78u(d) with respect to the court's disgorgement analysis.

The district court's failure to identify the statutory authority for its disgorgement award was erroneous because there are now two distinct statutory bases for disgorgement, animated by distinct purposes. As addressed above, before *Liu* this Court's jurisprudence referred to compensating securities fraud victims as a "distinctly secondary goal" of disgorgement, which was subordinate to its "primary purpose" of deterring violations by "depriving violators of their ill-gotten gains." *Fischbach*, 133 F.3d at 175. *Liu* rejected this principle, looking to

§ 78u(d)(5)—the sole statutory authority at the time for disgorgement awards in SEC enforcement actions—and held that permissible "equitable relief" under § 78u(d)(5) required a disgorgement award to be "awarded for victims." *Liu*, 140 S. Ct. at 1937.

The 2021 Amendments, which enable the SEC to seek "disgorgement of any unjust enrichment," perhaps harken back to pre-*Liu* cases emphasizing the importance of ensuring that a securities violator could not retain the amount "by which he was unjustly enriched." *Commonwealth Chem.*, 574 F.2d at 102. Simply put, the primary purpose of awarding disgorgement under § 78u(d)(5) is to compensate victims of a securities fraud, while the primary purpose of awarding disgorgement under § 78u(d)(3)(A)(ii) & (d)(7) is to deprive violators of their unjust enrichment. The two purposes may overlap in a particular case, but they are not necessarily coextensive. Here, the district court disregarded these distinctions and its award rests on flawed reasoning that conflates the applicable rationale for each remedy.

For example, the district court cites *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987), for the proposition that "[d]isgorgement is an equitable remedy that compels a defendant to 'give up the amount by which he was unjustly enriched.'" SPA18. But the court then proceeds to refer to its inquiry as to whether the Company or the investors were the "real victims of Govil's misconduct," as the

"crux of the issue between the parties." SPA20–21. Its focused inquiry regarding the "victims" could only align with *Liu*'s analysis, and does not relate to Mr. Govil's purported unjust enrichment. Thus, the district court's interpretation of *Tome* misses the mark.

In fact, that short paragraph of the *Tome* opinion expressly reiterated Judge Friendly's explanation in *Commonwealth Chemical* that "the primary purpose of disgorgement is *not to compensate investors*." *Tome*, 833 F.2d at 1096 (emphasis added) (quoting *Commonwealth Chem.*, 574 F.2d at 102). It makes zero reference to disgorgement as an "equitable remedy" and instead simply explains that the "district court possesses the equitable power to grant disgorgement *without inquiring whether, or to what extent, identifiable private parties have been damaged by the fraud*." *Id.* (citing *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985) (emphasis added)).

These propositions from *Tome*, *Commonwealth Chemical*, and *Blavin* simply do not square with the "equitable relief" contemplated by *Liu*, which made clear that disgorgement under § 78u(d)(5) must be "awarded for victims." *Liu*, 140 S. Ct. at 1937. Nor do they align in any way with the court's implication that it expected the SEC to "identify the victims of the fraud" and to make a distribution to them unless infeasible. SPA21–22. Moreover, the district court instructed the SEC that, "if it later determines that distribution to the investors is infeasible, it

must update the Court to permit consideration of whether directing such proceeds to the Treasury is permissible." *Id.* (citation omitted). This is significant, because, as addressed in more detail below, *Liu* suggested that directing funds into the Treasury may not be considered "for the benefit of investors" as required to be permissible under § 78u(d)(5). Indeed, courts have recently found direct deposit of disgorged funds into the Treasury to be acceptable if the award is made pursuant to § 78u(d)(7).

In sum, the district court's failure to identify the source of statutory authority pursuant to which it awarded disgorgement of $5,801,720 was erroneous because its order conflated the rationales for each distinct source of authority for the disgorgement remedy. Critically, the disgorgement award here fails under both provisions.

As addressed in more detail below, to the extent the district court intended to award the SEC "equitable disgorgement" under § 78u(d)(5) and *Liu*, its reasoning is fatally flawed because it expressly acknowledged "the investors may not have been financially harmed as a result of Govil's misconduct," SPA24, and the court's Final Judgment directed that funds paid by Mr. Govil be sent directly to the U.S. Treasury, SPA27. Additionally, should this Court reach the question, the district court's disgorgement award is also legally deficient under § 78u(d)(3)(A)(ii) &

(d)(7) because it transgresses the principles of unjust enrichment underlying those provisions, which the district court itself implicitly recognized.

## II. The district court's award of disgorgement cannot be sustained under § 78u(d)(5) because: (1) there was no finding the award was "appropriate or necessary for the benefit of investors" and (2) it directs the funds received from the disgorgement award to be paid directly to the U.S. Treasury.

Most naturally read, the district court's Opinion and Final Judgment sought to award disgorgement under § 78u(d)(5). The court invoked *Liu*, which focused only on § 78u(d)(5), and framed the central question as whether investors were the "victims" of Mr. Govil's alleged conduct. But § 78u(d)(5) requires a showing that investors have been harmed, and the court did not find that the SEC had made such a showing. In fact, the court acknowledged that "the investors may not have been financially harmed as a result of Govil's misconduct." SPA24. And the court also directed the SEC to send funds paid by Mr. Govil "to the United States Treasury," a disfavored position after *Liu*. The award of disgorgement thus cannot be upheld under § 78u(d)(5).

### A. To show that "equitable relief" is "appropriate or necessary for the benefit of investors" under § 78u(d)(5), the SEC must demonstrate that investors were harmed.

The plain language of § 78u(d)(5), its place in the broader statutory structure of § 78u, and the history of the provision all support an interpretation that the SEC must demonstrate—and a district court must find—that an investor has been

harmed before an award of disgorgement issues under § 78u(d)(5). To conclude otherwise would disregard the Supreme Court's and Congress's close attention to the separate bases authorizing the SEC to seek disgorgement in enforcement actions.

### 1. The plain language of § 78u(d)(5) supports the interpretation that the SEC must show investors were harmed to seek disgorgement under the statute.

The Supreme Court in *Liu* emphasized that the statute "restricts equitable relief to that which 'may be *appropriate or necessary* for the benefit of investors.'" 140 S. Ct. at 1947 (emphasis added) (quoting § 78u(d)(5)). Neither "appropriate" nor "necessary" is defined in the statute, and the surrounding language does not "indicate[] that they bear a technical sense." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012). Accordingly, the words should be given their "ordinary meaning." *United States v. Rosario*, 7 F.4th 65, 70 (2d Cir. 2021) (quoting *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)).

The adjective "appropriate" means "specially suitable" or "belonging peculiarly." *See* Webster's Third New International Dictionary 106 (1961). And the adjective "necessary" means "that must be by reason of the nature of things" or "absolutely required." *Id.* at 1510–11. In context, Congress's inclusion of the clause "appropriate or necessary" in describing "equitable relief" to be awarded "for the benefit of investors" thus indicates that there must be a finding of investor

*harm* to support disgorgement under § 78u(d)(5). *See Liu*, 140 S. Ct. at 1940 ("[A]

disgorgement award that does not exceed a wrongdoer's net profits and is awarded

*for victims* is equitable relief permissible under § 78u(d)(5)." (emphasis added));

*id.* at 1942 ("[T]o avoid transforming an equitable remedy into a punitive sanction,

courts restricted the remedy to an individual wrongdoer's net profits to be awarded

*for victims*." (emphasis added)). After all, a "victim"—the term used repeatedly by

the Court in *Liu*—is "[a] person *harmed* by a crime, tort, or other wrong." *Victim*,

Black's Law Dictionary (11th ed. 2019) (emphasis added).

Stated otherwise, if an investor has *not* been injured by the conduct for

which the SEC seeks disgorgement under § 78u(d)(5), there is no reason that relief

for the investor's benefit would be "specially suitable" or "absolutely required."

The statute does not authorize "'equitable relief' *at large*" so long as it benefits

investors, but instead authorizes only relief that is "appropriate or necessary." *See*

*id.* at 1948 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253 (1993), which

analyzed the statutory phrase "appropriate equitable relief").[3]

---

3. The Tenth Circuit's passing discussion of "appropriate . . . for the benefit of
   investors" does not carry persuasive weight. *See SEC v. Camarco*, No. 19-1486,
   2021 WL 5985058, at *20 (10th Cir. Dec. 16, 2021) (unpublished). The
   interpretation that § 78u(d)(5) authorizes any relief "that *may* provide
   *secondary* benefits to investors" is inconsistent with the plain language of the
   statute. *See id.* (emphases added). Other aspects of the majority decision in
   *Camarco* are more tightly reasoned.

**2.** **The structure of § 78u, amended post-*Liu*, supports the interpretation that SEC must show harm to investors in seeking disgorgement under § 78u(d)(5).**

The meaning of a statutory provision "can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 372 (2d Cir. 2022). And it is a "well-known canon of statutory construction that a statute should not be construed to render a word or clause inoperative." *See United States v. Peterson*, 394 F.3d 98, 106 (2d Cir. 2005) (citing *Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000)). Here, looking to § 78u as a whole supports the plain reading of § 78u(d)(5), *supra*, that the SEC must demonstrate harm to investors to obtain equitable relief under (d)(5).

As explained above, *Liu* dealt specifically with whether courts possess the authority under § 78u(d)(5) to award disgorgement. But the 2021 Amendments created a separate, distinct statutory basis for such a remedy. More specifically, the Amendments expanded § 78u(d)(3) to include "authority to seek disgorgement" and specified that the SEC, when it believes a securities violation has been committed, may bring an action seeking "disgorgement under paragraph (7) [§ 78u(d)(7)] of any unjust enrichment by the person who received such unjust enrichment as a result of such violation." Paragraph 7, in turn, provides: "In any action or proceeding brought by the Commission under any provision of the

securities laws, the Commission may seek, and any Federal court may order, disgorgement."

There is no mention of "equitable relief" or "investors" in (d)(3) or (d)(7) and thus no similar requirement that disgorgement under those provisions must be "awarded for victims" to satisfy traditional equitable principles. *See Liu*, 140 S. Ct. at 1940; *id.* at 1948 ("The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit."). The primary focus instead in § 78u(d)(3) & (d)(7) is depriving a securities violator of any "unjust enrichment." If § 78u(d)(5) were expanded more broadly than in *Liu* as requiring only that a wrongdoer be deprived of his ill-gotten gains, then the provision would render superfluous § 78u(d)(3) & (d)(7), which provide for disgorgement of unjust enrichment elsewhere in the statute. *See Peterson*, 394 F.3d at 106 (rejecting statutory interpretation offered by government because it would render certain words "superfluous").

As far as Mr. Govil can tell, this Court has not yet reviewed an award of disgorgement under § 78u(d)(3) & (d)(7), as amended, or otherwise interpreted the 2021 Amendments. Indeed, the Fifth Circuit is the only court of appeals that has addressed the Amendments at length. *See SEC v. Hallam*, 42 F.4th 316, 334–44 (5th Cir. 2022). The interpretation Mr. Govil urges—that § 78u(d)(5) and § 78u(d)(3) & (d)(7) provide separate bases for disgorgement—is consistent with

*Hallam*, which concluded that "Sections 78u(d)(3) and (d)(7) authorize legal 'disgorgement' apart from the equitable 'disgorgement' permitted by *Liu*." *Id.* Thus, the present structure of § 78u as a whole, including the distinct remedy authorized by the 2021 Amendments, makes clear that an award under § 78u(d)(5) must be supported by a finding that investors were harmed.

### B. The SEC failed to demonstrate, and the district court failed to find, that investors were harmed as a result of Mr. Govil's alleged conduct.

The district court's reasoning for ordering disgorgement cannot be squared with § 78u(d)(5)'s requirement that relief must be "appropriate or necessary" for investors or with *Liu*'s interpretation that a permissible award under § 78u(d)(5) must be "awarded for victims," 140 S. Ct. at 1937, because the district court did not actually find that investors of Cemtrex had been harmed. This failure alone warrants vacatur and remand.

The district court expressly acknowledged in its Opinion that "though there was a risk of significant loss, *the investors may not have been financially harmed as a result of Govil's misconduct.*" SPA24 (emphasis added). The court did not further elaborate on this finding, but it could have only reached this conclusion based on evidence before it—unrebutted by the SEC—that the investors in the alleged offerings may very well have *profited* from their investments.

36

More specifically, Mr. Govil submitted an affidavit detailing the three stock offerings alleged in the Complaint. A291–98. Two of those offerings, issued in April 2016 and November 2017 to "certain institutional investors," involved convertible notes valued at approximately $2.5 million, which could be converted into Cemtrex common shares after six months. A295. The two convertible notes issued pursuant to those offerings carried very high interest rates and an original-issue discount, which increased the value of the note by approximately 15%. A295–96. Additionally, Mr. Govil explained that if Cemtrex elected to convert the notes into Cemtrex shares after six months, those shares were issued to the institutional investor at a steep discount to the market trading price, allowing the accredited institutional investors to make significant returns on their initial investments. A296.

The April 2016 offering in particular was made to "an accredited institutional investor" and featured a convertible note in the amount of $525,000. A296. Mr. Govil noted that if the investor sold the shares the day they were converted, the investor "would have earned an approximate profit of $284,061 on its initial investment of $500,000." *Id*. The November 2017 offering was also made to "an accredited institutional investor" and featured a convertible note in the amount of $2,300,000. *Id*. Mr. Govil similarly averred that if the investor sold

those shares the day they were converted, the investor "would have earned an approximate profit of $970,806 on its initial investment of $1,995,000." *Id*.

Finally, Mr. Govil explained that the December 2016 offering involved a subscription-rights offering that gave purchasers a "unit" consisting of one share of Series 1 Preferred Stock in Cemtrex (CETXP) and two Series 1 Warrants for a price of $10 per unit. A296–97. Mr. Govil averred that Series 1 Preferred Stock pays an annual 10% dividend in perpetuity, that at all times during the relevant period Cemtrex had sufficient assets to fund its operating expenses and carry out its business activities, and that Series 1 Preferred Stockholders did, in fact, receive the 10% dividend to which they were entitled during the relevant period. *Id*.

The SEC never engaged with this information before the district court, falling back instead to general and vague assertions that investors in the offerings had been harmed but without specifying who those investors were and whether they had sold shares or still held them. Despite Mr. Govil's unrebutted contention that the investors in the relevant notes offerings may very well have *profited* from their investments, the district court concluded that some abstract, theoretical set of investors "are victims of Govil's misconduct." *See* SPA20.

In doing so, the court disregarded both the plain language of § 78u(d)(5) requiring an award of disgorgement thereunder to be "appropriate or necessary" for investors and *Liu*'s instruction that it must be "awarded for *victims*." Such dictates

flow from equitable principles and avoid transforming profits remedies into penalties because they ensure a wrongdoer pays only fair compensation "to the person wronged." *Liu*, 140 S. Ct. at 1943 (citing *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 207 (1881); *Tilghman v. Proctor*, 125 U.S. 136, 145–46 (1888)). Here, because the district court did not find Cemtrex investors suffered losses and instead acknowledged "the investors may not have been financially harmed as a result of Govil's misconduct," SPA24, its disgorgement award cannot be sustained under § 78u(d)(5).

### C. The district court's Final Judgment is inconsistent with *Liu* because it directs the funds received from the disgorgement award to be paid directly to the U.S. Treasury.

The district court's May 24, 2022 Opinion provided: "The SEC has represented that it is feasible to identify the victims of the fraud. However, if it later determines that distribution to investors is infeasible, it must update the Court to permit consideration of whether directing such proceeds to the Treasury is permissible." SPA21–22 (citation omitted). With no record of such an update, the court's Final Judgment dated July 5, 2022, nonetheless directed the SEC to "send the funds paid pursuant to this Final Judgment to the United States Treasury." SPA27. This direction renders the disgorgement award erroneous under § 78u(d)(5) and *Liu*.

In *Liu*, the Supreme Court expressed concern that "courts have occasionally awarded disgorgement in . . . ways that test the bounds of equity practice," including "by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims." *Liu*, 140 S. Ct. at 1946. It considered "the SEC's disgorgement remedy in such incarnations" to be "in considerable tension with equity practices." *Id*. The Court acknowledged "[t]he statute provides limited guidance as to whether the practice of depositing defendant's gains with the Treasury satisfies the statute's command that any remedy be 'appropriate or necessary for the benefit of investors.'" *Id*. 1947–48.

The Court in *Liu* also emphasized that the "equitable nature of the profits remedy *generally requires the SEC to return a defendant's gains to wronged investors for their benefit*." *Id*. at 1948 (emphasis added). When faced with the SEC's suggestion that its "practice of depositing disgorgement funds with the Treasury may be justified where it is infeasible to distribute the collected funds to the investors," the Court considered it an "open question" whether the SEC's "practice" satisfies "the SEC's obligation to award relief 'for the benefit of investors' and is consistent with the limitations of § 78u(d)(5)." *Id*. Significantly, the *Liu* Court ultimately determined that it did not need to address the issue because the parties had not identified "a specific order in th[e] case directing any proceeds to the Treasury." *Id*. at 1949. Such an order exists in this case.

Notwithstanding the supposed "open question" of whether distribution of disgorged funds to the Treasury is ever permissible under § 78u(d)(5), other federal courts of appeals have already made clear since *Liu* that return to investors is the preferred solution. For example, the Tenth Circuit in *Camarco* affirmed the district court's order where it "provided guidelines for the distribution of disgorged funds . . . , precluded the disgorged funds from going to the benefit of the U.S. Treasury and directed that, to the maximum extent reasonably possible, the funds should be used to reimburse the victims of [defendant's] thefts and fraud." *SEC v. Camarco*, 2021 WL 5985058, at *11 (10th Cir. 2021) (unpublished). There, the Tenth Circuit affirmed the district court's decision to designate a victim eligible to recover the disgorged monies because "depositing the money in the U.S. Treasury or permitting [defendants] to retain the money—would provide no benefit, direct or secondary, to investors." *Id*. at *20. Similarly, the Fifth Circuit found *Liu* to be "easily satisfie[d]" where "the work ha[d] already been done" to identify the defrauded investors and the district court's order required "disbursements to already-identified victims with court supervision to ensure compliance with that edict." *SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021).

Many district courts in this Circuit, however, including the lower court here, have suggested that *Liu* did not foreclose distribution to the Treasury "*when* it is infeasible to distribute such funds to investors." *See also SEC v. Bronson*, 2022

WL 1287937, at *14 (S.D.N.Y. Apr. 29, 2022) (citing *Penn*, 2021 WL 1226978, at

*14 (emphasis added)). And such courts have ordered awards where the SEC has

(1) "committed to conducting a feasibility analysis" and (2) "if it determines that

distribution to investors is infeasible," updating "the Court so that [it] can decide

whether directing such proceeds to the Treasury is permissible." *Penn*, 2021 WL

1226978, at *14.[4] The approach gets the analysis under § 78u(d)(5) exactly

backwards, and this Court should correct the error.

Notably, the Middle District of Florida recently concluded that disgorgement

to the Treasury is more appropriate under the 2021 Amendments than under

§ 78u(d)(5) "because subsections (d)(3) and (7) do not contain the 'for the benefit

of investors' language that is included in subsection (d)(5)." *SEC v. Spartan Sec.*

*Grp., Ltd.*, 2022 WL 3224008, at *9 (M.D. Fla. Aug. 10, 2022). There, the SEC

conceded that "distribution of the disgorged funds to harmed investors [was] not

feasible" and took the position that "the only alternative that is consistent with

equitable principles is to send the disgorged funds to the Treasury." *Id.* In support

---

4. *See also SEC v. Navellier & Assocs., Inc.*, 2021 WL 5072975, at *3 (D. Mass.
   2021) ("If the Commission determines . . . that a distribution is not feasible . . .
   it shall advise the Court and seek the Court's guidance on whether 'a specific
   order . . . directing any proceeds to the Treasury' is permissible."); *SEC v.*
   *Westport Cap. Mkts., LLC*, 547 F. Supp. 3d 157, 170 (D. Conn. 2021) (finding
   disgorgement consistent with *Liu* where the "SEC notes that if disgorgement is
   infeasible, 'it will advise the Court and will seek the Court's approval for its
   allocation of the collected funds'").

of this position, the SEC deviated from *Liu* and the § 78u(d)(5) analysis, instead arguing that the 2021 Amendments "provide the courts with greater flexibility to determine where collected disgorged funds may be distributed, because the provision omits the phrase 'for the benefit of investors.'" *Id*. (internal alterations omitted).

The district court in *Spartan* agreed with the SEC's position. It further noted that even assuming *arguendo* that it still had to "balance the equities under *Liu*" following the 2021 Amendments, sending the funds to the Treasury was still better than "allowing [defendant] to retain to the money." *Id*. Thus, *Spartan* suggests that direct distribution to the Treasury is not appropriate under § 78u(d)(5) and that the justification for distributing funds into the Treasury *at all* is premised on principles of unjust enrichment, ensuring that a wrongdoer is not allowed to retain the benefit of his ill-gotten gains.

Here, the district court's orders make a hash of the foregoing concepts. On the one hand, the court's Opinion suggests disgorgement was awarded pursuant to § 78u(d)(5)—as interpreted by *Liu*—and observes: "[t]he SEC has represented that it is feasible to identify the victims of the fraud" and instructed "if it later determines that distribution to investors is infeasible, it must update the Court to permit consideration of whether directing such proceeds to the Treasury is permissible." SPA21–22 (citing *Penn*, 2021 WL 1226978, at *14). On the other

hand, the court's Final Judgment simply instructs the SEC to deposit disgorged funds directly into the U.S. Treasury. SPA27. To the extent the district court awarded disgorgement pursuant § 78u(d)(5), it erred in ordering funds directly to the U.S. Treasury.

**III.    The district court's disgorgement award cannot be sustained under the 2021 Amendments because requiring Mr. Govil to disgorge money directly to the U.S. Treasury without properly considering the value of the shares in Cemtrex he relinquished is inconsistent with principles of unjust enrichment.**

As this Court has noted, "[i]n general, a federal appellate court does not consider an issue not passed upon below." *Int'l Strategies Grp., Ltd. v. Ness*, 645 F.3d 178, 183 n.12 (2d Cir. 2011) (quoting *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir. 2001)); *see also, e.g.*, *Hu v. City of New York*, 927 F.3d 81, 102 n.6 (2d Cir. 2019). Here, the district court never analyzed the 2021 Amendments or considered how those changes affect the statutory authority for disgorgement awards. For that reason alone, if this Court concludes the award of disgorgement cannot be sustained under § 78u(d)(5), *see supra*, it should vacate and remand rather than consider application of the 2021 Amendments in the first instance. Should the Court reach the question, the disgorgement award cannot be sustained under the 2021 Amendments because the district court's failure to consider Mr. Govil's relinquishment of shares is inconsistent with the predicate for that statutory authority—unjust enrichment.

**A.    A permissible disgorgement award under the 2021 Amendments must be limited to the amount of the alleged wrongdoer's unjust enrichment.**

As explained above, the 2021 Amendments—namely § 78u(d)(3)(A)(ii) & § 78u(d)(7)—codified the authority for district courts to order disgorgement awards in SEC enforcement actions based on the amount of the alleged violator's "unjust enrichment." To be clear, § 78u(d)(3)(A)(ii) empowers the SEC to "seek disgorgement under paragraph (7) *of any unjust enrichment* by the person who received such *unjust enrichment* as a result of the violation."

There can be no question that "unjust enrichment" is the lodestar guiding developing interpretations of the 2021 Amendments. *See, e.g.*, *SEC v. Sharp*, 2022 WL 4085676, at *14 (D. Mass. Sept. 6, 2022) (quoting 15 U.S.C. § 78u(d)(3)(ii)) (emphasis added); *Spartan Sec. Grp.*, 2022 WL 3224008, at *8 (quoting 15 U.S.C. § 78u(d)(3)(ii)). The Southern District of New York recently emphasized: "In fact, the statute makes clear that the rational purpose is to recover 'any unjust enrichment by the person who received such unjust enrichment as a result of [the] violation.'" *SEC v. Gallison*, 2022 WL 604258, at *6 (S.D.N.Y. 2022) (quoting 15 U.S.C. § 78u(d)(3)(A)(ii)) (citing *SEC v. Palmisano*, 135 F.3d 860, 865 (2d Cir. 1998))). And the Fifth Circuit has interpreted § 78u(d)(3)(A)(ii) to mean that disgorgement awards "must consist of any unjust enrichment." *Hallam*, 42 F.4th at 340 (internal quotations omitted).

The question, then, is what constitutes a wrongdoer's unjust enrichment that may be disgorged under the 2021 Amendments. Black's Law Dictionary defines "unjust enrichment" as:

> 1. The *retention of a benefit* conferred by another not as a gift, but instead in circumstances where compensation is reasonably expected.

> 2. A benefit obtained from another, not intended as a gift and not legally justifiable, *for which the beneficiary must make restitution or recompense*. . . . The resulting claim of unjust enrichment *seeks to recover the defendant's gains* . . . .

*Unjust Enrichment*, Black's Law Dictionary (11th ed. 2019) (emphases added). Simply put, unjust enrichment constitutes a wrongdoer's *retention* of the profits of their wrongdoing.

For decades this Court articulated a goal aligned with these principles; namely, disgorgement as a method of "forcing a defendant *to give up the amount by which he was unjustly enriched*." *See Commonwealth Chem.*, 574 F.2d at 102 (emphasis added). In fact, from the moment this Court approved awards akin to SEC disgorgement, it reasoned: "Restitution of the profits on these transactions *merely deprives the appellants of the gains* of their wrongful conduct." *Texas Gulf Sulphur*, 446 F.2d at 1308 (emphasis added). District courts that have interpreted the 2021 Amendments continue to emphasize the overarching purpose of ensuring that the wrongdoer is not allowed to "retain the money." *See, e.g.*, *Spartan Sec. Grp.*, 2022 WL 3224008, at *9.

The overwhelming weight of authority leads to this simple conclusion: the purposes of a disgorgement award under the 2021 Amendments are satisfied if the alleged wrongdoer relinquishes the profits from his wrongdoing. Mr. Govil has already done so here.

**B.     In this case, a permissible disgorgement award under the 2021 Amendments must account for the value of the shares Mr. Govil relinquished to Cemtrex.**

There can be no question that Mr. Govil returned a substantial value to Cemtrex when he relinquished all of his shares in the Company. Cemtrex was incorporated in Delaware, and Delaware's "corporation law provides great flexibility to shareholders in creating the capital structure of their firm." *Lacos Land Co. v. Arden Grp., Inc.*, 517 A.2d 271, 275 (Del. Ch. 1986) (citing *Providence and Worcester Co. v. Baker*, 378 A.2d 121 (Del. 1977)). It is elementary under Delaware law that "[d]iffering classes of stock with differing voting rights are permissible." *Id.* (citing 8 Del. C. § 151(a)).

So, for example, founders or controlling shareholders of a private company seeking to raise cash by taking their company public may elect to establish two classes of common stock: one class that allows them to retain voting control as their economic stake in the company is diluted by the infusion of cash from the public; and a second that allows members of the public to obtain a large economic stake in the company but without commensurate voting rights. Broadly speaking,

this is how public corporations such as Alphabet, ViacomCBS, and various others have structured their classes of stock.[5]

Corporations may also elect to issue shares of "preferred stock," which may or may not including voting rights, but regardless often differ from shares of common stock in other important ways. For example, "[i]f the corporation is liquidated, the preferred is paid off in full before the common can claim any assets." *See* Ben Walther, *The Peril and Promise of Preferred Stock*, 39 Del. J. Corp. L. 161, 167 (2014) (citing 11 William M. Fletcher, *Fletcher's Cyclopedia of the Law of Private Corporations* § 5303 (West 2013)). "The preferred's seniority also extends to current income, meaning that the common cannot be paid any dividends until the dividends promised to the preferred are paid in full." *Id.* (citing *Fletcher Cyc. Corp.*, §§ 5299, 5446); *see also, e.g.*, *In re Primedia, Inc. S'holders*

---

5. *See* Investopedia, *Alphabet's GOOG vs. GOOGL: What's the Difference?* (updated Oct. 15, 2022) ("The main difference between the GOOG and GOOGL stock ticker symbols is that GOOG shares have no voting rights, while GOOGL shares do."), https://www.investopedia.com/ask/answers/052615/whats-difference-between-googles-goog-and-googl-stock-tickers.asp (last accessed Nov. 11, 2022); Paramount, *Shareholder Services, Alerts, & FAQS* (2022) ("Class A common stock is voting stock, and Class B is non-voting stock. There is no difference between the two classes except for voting rights. There are, however, far more shares of Class B [non-voting stock] outstanding, so most of the trading occurs in that class."), https://ir.paramount.com/shareholder-services (last accessed Nov. 11, 2022).

*Litig.*, 67 A.3d 455, 460 (Del. Ch. 2013) (explaining how Delaware corporation issued series of preferred stock that paid an "annual dividend").

Here, Mr. Govil presented evidence to the district court that, pursuant to a settlement with Cemtrex, he gave the Company an agreed-upon value of $7,100,000, comprised of a promissory note in the amount of $1,533,280 and relinquishment of all securities he held in Cemtrex. A175–78. Specifically, Mr. Govil surrendered 1,000,000 shares of Series A Preferred Stock, 50,000 shares of Series C Preferred Stock, and 469,949 shares of Series 1 Preferred Stock (CETXP), and forfeited all options to purchase shares of common stock. A175. The district court recognized that Mr. Govil and Cemtrex agreed that the value of the surrendered securities was $5,566,720, but elected to disregard the fact that the relinquished shares had *any value* when rendering its disgorgement award. *See* SPA21 & n.1. This was error.

For example, at the time of the settlement, Cemtrex's Series 1 Preferred Shares (CETXP) traded publicly at $2.13 per share. A273 n.4. Mr. Govil relinquished all 469,949 shares of Series 1 Preferred he owned, or roughly $1 million based on the contemporaneous trading price. Additionally, it is informative that the Company generally—and other Cemtrex investors specifically—*benefited* from Mr. Govil's forfeiture of Series 1 Preferred Stock.

For the Company, the retirement of such a large number of Series 1 Preferred Shares relieved it of a significant obligation in terms of the annual dividends it would have otherwise been required to pay. Remaining holders of Series 1 Preferred Shares—some of whom may have acquired shares in the December 2016 subscription rights offering—would have benefited through entitlement to a conceivably greater annual dividend and relatively greater voting power. And holders of Cemtrex common stock would have also benefited from a relative increase in voting power, a decrease in the Company's annual dividend obligations to the remaining holders of Series 1 Preferred Shares, and a significant reduction in the total preferred shares that must be paid out first in the event of a liquidation of the Company. Thus, Mr. Govil's relinquishment of shares certainly constituted a substantial return of value to the Company. Any award of disgorgement under the 2021 Amendments must consider the value of the Series 1 Preferred and other shares Mr. Govil surrendered.

Curiously, in stark contrast to the district court's disregard of the value of the relinquished shares, it agreed to deduct the value of the promissory note from the SEC's requested disgorgement award, finding:

> The promise to the investors was that their offering proceeds would be used for Cemtrex expenses. *As the funds from the promissory note will presumably be placed in the company's account and used for corporate expenses*, the original promise to the purchasers of the offerings will, in fact, be realized.

SPA21 (emphasis added). This logic should have been applied to Mr. Govil's relinquishment of all securities held in Cemtrex.

Indeed, the district court posed this question: "whether Govil's surrendering of stock and promise of additional payment *to* Cemtrex rights the wrongs to the actual victim of his misconduct." SPA20. It recognized: "After all, if Cemtrex is the victim, then the Settlement Agreement would have properly 'pa[id]'. . . a fair compensation to the person wronged" and "requiring disgorgement would then serve as an improper punitive measure." *Id*. (quoting *Tilghman v. Proctor*, 125 U.S. 136, 146 (1888)). That is, the district court implicitly recognized that the disgorgement award would have been improper under § 78u(d)(3) & (d)(7) because Mr. Govil relinquished an agreed-upon value of $5.6 million in shares to Cemtrex. Nevertheless, despite acknowledging that the SEC alleged that Mr. Govil promised proceeds of the offerings "would be used for various corporate purposes," SPA20, the district court incorrectly concluded that the investors were the "real victims" of Mr. Govil's alleged misconduct, instead of the Cemtrex, *see* SPA21.

**C.  Recognizing that Mr. Govil's relinquishment of shares to Cemtrex satisfies the aims of disgorgement under the 2021 Amendments is consistent with other aspects of corporate law.**

If this matter involved a private action as opposed to one brought by the SEC, it could only be pursued as a shareholder derivative lawsuit, whereby

recovery of any damages would be paid to Cemtrex. This Court has embraced the *Tooley* standard for determining whether claims against a company must be asserted directly or derivatively. *See, e.g.*, *F5 Cap. v. Pappas*, 856 F.3d 61, 72 (2d Cir. 2017); *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 694, 700 (2d Cir. 2015). Under *Tooley*, such analysis is guided by two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

Here, despite the district court's flawed conclusion that the investors were the "real victims," there can be no question that the alleged harm was suffered by Cemtrex. In fact, as addressed above, the investors likely benefited from their participation in the offerings and the district court acknowledged "the investors may not have been financially harmed as a result of Govil's misconduct." SPA24. Most significant, the crux of the SEC's Complaint is the allegation that Mr. Govil raised funds from investors for "general corporate purposes" but then misappropriated the funds *from Cemtrex* for his own personal use. This is a classic claim of mismanagement, lacking any alleged injury specific to the investors that participated in those offerings. *See, e.g.*, *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("A claim of mismanagement . . . represents a direct wrong to

the corporation that is indirectly experienced by all shareholders."). Simply put, if the investors who participated in the offerings wished to pursue private lawsuits based on Mr. Govil's alleged actions, they could not have pursued direct claims, and instead would have been limited to pursing a derivative lawsuit on behalf of Cemtrex.

As it stands, Mr. Govil has already returned a substantial value to Cemtrex to cover any such allegations. It would be inequitable and inconsistent with the rationale supporting disgorgement of unjust enrichment under the 2021 Amendments to allow the SEC to recover an additional $5,566,720 from Mr. Govil when he has already returned that value to the Company.

Put differently, to satisfy principles of unjust enrichment under the 2021 Amendments, the amount of any disgorgement award must be limited to ill-gotten gains *retained* by Mr. Govil. To the extent the calculated value of the relinquished shares is subject to further dispute, Mr. Govil respectfully asks this Court to vacate the district court's disgorgement award and remand with instructions for a more fulsome inquiry regarding that valuation in the district court.

**CONCLUSION**

For the foregoing reasons, Mr. Govil respectfully requests that the Court vacate the district court's decision awarding disgorgement on Count I of the Complaint and remand with instructions.

Dated: November 14, 2022

Respectfully submitted,

 */s/ Matthew Aaron Ford*
Matthew Aaron Ford
Adam C. Ford
Stephen R. Halpin III
FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 100016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047
mford@fordobrien.com
aford@fordobrien.com
shalpin@fordobrien.com

*Counsel for Defendant–Appellant*
*Aron Govil*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 21(d), this document contains 12,510 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word, Version 16.66, in 14 point Times New Roman font.

Dated: November 14, 2022

 */s/ Matthew Aaron Ford*
Matthew Aaron Ford
FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 100016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047
mford@fordobrien.com

# SPECIAL APPENDIX

**i**

**TABLE OF CONTENTS**

                                                                    **Page**

Judgment as to Defendant Aron Govil, dated
   July 28, 2021, Appealed From, with Attachment ..   SPA1

Opinion and Order of the Honorable J. Paul Oetken,
   dated May 24, 2022, Appealed From.....................   SPA17

Final Judgment, dated July 5, 2022, Appealed From.   SPA26

15 U.S.C.A § 78u (West) ...........................................   SPA29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

                    v.

ARON GOVIL,

                              Defendant.

---

21 Civ. 6150 (JPO)

## JUDGMENT AS TO DEFENDANT ARON GOVIL

The Securities and Exchange Commission having filed a Complaint and Defendant Aron Govil having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction and except as otherwise provided herein in paragraph IX); waived findings of fact and conclusions of law; and waived any right to appeal from this Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)      to employ any device, scheme, or artifice to defraud;

1

(b)     to make any untrue statement of a material fact or to omit to state a material fact
        necessary in order to make the statements made, in the light of the circumstances
        under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would
        operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in
Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who
receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers,
agents, servants, employees, and attorneys; and (b) other persons in active concert or
participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933
(the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any
means or instruments of transportation or communication in interstate commerce or by use of the
mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact
        or any omission of a material fact necessary in order to make the statements
        made, in light of the circumstances under which they were made, not misleading;
        or

(c)     to engage in any transaction, practice, or course of business which operates or
        would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

### III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 16(a) of the Exchange Act [ 15 U.S.C. § 78p] and Rule 16a-3 promulgated thereunder [17 CFR § 240.16a-3] by, directly or indirectly, in the absence of any applicable exemption, failing to timely report the acquisition or disposition of a covered beneficial interest by filing the required form(s).

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

### IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and/or Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], Defendant is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C.

SPA4

§ 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1].

## VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, in connection to Counts II, III, and IV of the Complaint, Defendant is liable for disgorgement of $626,782, representing net profits gained  as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $76,693.95, and a civil penalty in the amount of $620,000 pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].  Defendant shall satisfy this obligation by paying $1,323,475.95 to the Securities and Exchange Commission within 90 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Aron Govil as a defendant in this action; and specifying that payment is made

pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

interest by using all collection procedures authorized by law, including, but not limited to,

moving for civil contempt at any time after 90 days following entry of this Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all

collection procedures authorized by law, including the Federal Debt Collection Procedures Act,

28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders

issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30

days of the entry of this Judgment pursuant to 28 U.S.C. § 1961.  The Commission shall hold the

funds, together with any interest and income earned thereon (collectively, the "Fund"), pending

further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's

approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VII.

Upon motion of the Commission, the Court shall determine whether it is appropriate to order additional disgorgement of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty.  If additional

disgorgement is ordered, Defendant shall pay prejudgment interest thereon based on the rate of

interest used by the Internal Revenue Service for the underpayment of federal income tax as set

forth in 26 U.S.C. § 6621(a)(2).  In connection with the Commission's motion for additional

disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will

be precluded from arguing that he did not violate the federal securities laws as alleged in the

Complaint; (b) Defendant may not challenge the validity of the Consent or this Final Judgment;

(c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as

and deemed true by the Court; and (d) the Court may determine the issues raised in the motion

on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony,

and documentary evidence, without regard to the standards for summary judgment contained in

Rule 56(c) of the Federal Rules of Civil Procedure.  In connection with the Commission's

motion for additional disgorgement and/or civil penalties, the parties may take discovery,

including discovery from appropriate non-parties.

## VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent

(Attachment A) is incorporated herein with the same force and effect as if fully set forth herein,

and that Defendant shall comply with all of the undertakings and agreements set forth therein.

## IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of

exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the

allegations in the complaint are true and admitted by Defendant, and further, any debt for

disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this

Judgment or any other judgment, order, consent order, decree or settlement agreement entered in

connection with this proceeding, is a debt for the violation by Defendant of the federal securities

laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the

Bankruptcy Code, 11 U.S.C. §523(a)(19).


X.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

XII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated:  July 28, 2021

_____
J. PAUL OETKEN
United States District Judge

**ATTACHMENT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | 21 Civ. 6150 (JPO) |
| v. | |
| ARON GOVIL, | |
| Defendant. | |

---

**CONSENT OF DEFENDANT ARON GOVIL**

1.      Defendant Aron Govil ("Defendant") waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

2.      Without admitting or denying the allegations of the complaint (except as provided herein in paragraph 13 and except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the Judgment in the form attached hereto (the "Judgment") and incorporated by reference herein, which, among other things:

      (a)      permanently restrains and enjoins Defendant from violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; Section 17(a) of the Securities Act of 1933 ("Securities Act"); and Section 16(a) of the Exchange Act and Rule 16a-3 thereunder;

      (b)      in connection to Counts II, III, and IV of the Complaint, orders Defendant to pay disgorgement in the amount of $626,782, plus prejudgment interest thereon in the amount of $76,693.95; and


(c)     in connection with Counts II, III, and IV of the Complaint, orders Defendant to pay a civil penalty in the amount of $620,000 under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

(d)     in connection with Count I of the Complaint, provides that the parties will either settle the amount of disgorgement, prejudgment interest and civil penalty of the claim and if the parties cannot agree they will have the Court decide whether Defendant shall pay additional disgorgement, prejudgment interest and civil penalty and the amount based on a motion by the Plaintiff;

(e)     permanently prohibits Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(f)     permanently bars Defendant from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

3.     Defendant acknowledges that the civil penalty paid pursuant to the Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant agrees that he shall not, after offset or

reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

4. Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

5. Defendant agrees that, in connection with Count I in the Complaint, the Court shall determine whether it is appropriate to order additional disgorgement of ill-gotten gains

3

and/or a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the

disgorgement and/or civil penalty.  The Defendant further understands that, if additional

disgorgement is ordered, Defendant shall pay prejudgment interest thereon based on the rate of

interest used by the Internal Revenue Service for the underpayment of federal income tax as set

forth in 26 U.S.C. § 6621(a)(2).  Defendant further agrees that in connection with the

Commission's motion for additional disgorgement and/or civil penalties, and at any hearing held

on such a motion: (a) Defendant will be precluded from arguing that he did not violate the

federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity

of this Consent or the Judgment; (c) solely for the purposes of such motion, the allegations of the

Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine

the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn

deposition or investigative testimony, and documentary evidence, without regard to the standards

for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.  In

connection with the Commission's motion for additional disgorgement and/or civil penalties, the

parties may take discovery, including discovery from appropriate non-parties.

6.      Defendant waives the entry of findings of fact and conclusions of law pursuant to

Rule 52 of the Federal Rules of Civil Procedure.

7.      Defendant waives the right, if any, to a jury trial and to appeal from the entry of

the Judgment.

8.      Defendant enters into this Consent voluntarily and represents that no threats,

offers, promises, or inducements of any kind have been made by the Commission or any

member, officer, employee, agent, or representative of the Commission to induce Defendant to

4

SPA13

enter into this Consent.

9.       Defendant agrees that this Consent shall be incorporated into the Judgment with the same force and effect as if fully set forth therein.

10.      Defendant will not oppose the enforcement of the Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

11.      Defendant waives service of the Judgment and agrees that entry of the Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty days after the Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Judgment.

12.      Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding.  Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.  Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations.  Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization.  This statutory disqualification has consequences that

SPA14

are separate from any sanction imposed in an administrative proceeding.  In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

13.    Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that Defendant does not deny the allegations; (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint; and (iv) stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, that the allegations in the complaint are true, and further, that any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the

SPA15

Bankruptcy Code, 11 U.S.C. §523(a)(19).  If Defendant breaches this agreement, the Commission may petition the Court to vacate the Judgment and restore this action to its active docket.  Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

14.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action.  For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

15.     Defendant agrees that the Commission may present the Judgment to the Court for signature and entry without further notice.

16.    Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Judgment.

Dated: _4/ 1 / 21_

_____
Aron Govil

On April _1_, 2021, Aron Govil, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent.

_____
Notary Public
Commission expires: 9/18/2021

FRANKLIN RIVERA
Notary Public, State of New York
No. 01RI6364751
Qualified in Nassau County
Commission Expires September 18, 2021

Approved as to form:

_____
Joseph Dever, Esq.
Cozen O'Connor
3 WTC, 175 Greenwich Street
55th Floor | New York, NY 10007
(212) 453-3916
Attorney for Defendant

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | 21-CV-6150 (JPO) |
| -v- | OPINION AND ORDER |
| ARON GOVIL, | |
| Defendant. | |

J. PAUL OETKEN, District Judge:

Plaintiff Securities and Exchange Commission ("SEC") brings this action against Defendant Aron Govil, asserting violations of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77a *et seq.*, and violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 14 U.S.C. §§ 78a *et seq.* (Dkt. No. 1 ("Compl.").) Before the Court now is the SEC's motion for judgment imposing additional remedies as to Count I (Dkt. No. 14), which Govil opposes (Dkt. No. 18).

For the following reasons, the SEC's motion is granted in part and denied in part.

## I.     Factual Background

On July 19, 2021, the SEC filed a complaint charging Govil with violations of the Securities Act and the Exchange Act. (*See* Compl.). The following month, this Court entered a partial judgment against Govil upon his consent. (Dkt. No. 7.) In the partial judgment, Govil consented to all the relief the SEC sought to fully settle Counts II, III, and IV, and the non-monetary relief the SEC sought with respect to all counts. (*Id.*) Thus, the sole remaining issue before the Court is the monetary relief, if any, on Count I.

As relevant to this motion, Count I of the Complaint alleges that from 2016 to 2017, Govil directed Cemtrex, a purported diversified industrial and technology company, to engage in fraudulent securities offerings.  (Compl. ¶ 2.)  Specifically, the Complaint alleges that Govil caused Cemtrex to represent to investors that the offering proceeds would be used for corporate purposes, but in fact, Govil misappropriated $7,335,000 and used these funds to pay for unrelated personal expenses.  (*See* Compl. ¶¶ 22–28.)

On February 26, 2021, Govil entered into a settlement and release agreement (the "Settlement Agreement") with Cemtrex.  (*See* Dkt. No. 16-9.)  Based on the terms of the Settlement Agreement, Govil agreed to pay Cemtrex $7.1 million in the form of (1) Cemtrex stock owned by Govil and valued at $5,566,720 and (2) a promissory note in the amount of $1,533,280 issued by Govil payable with interest within two years (*i.e.*, by February 26, 2023). (Dkt. No. 16-9 at 1.)  In exchange, Cemtrex released the company's claims against Govil.  (*Id.*) While Govil has surrendered all of his Cemtrex stock, he has not yet paid Cemtrex pursuant to the promissory note.  (Dkt. No. 15 at 6.)

## II.    Discussion

### A.    Additional Disgorgement of $7,335,000

Disgorgement is an equitable remedy that compels a defendant to "give up the amount by which he was unjustly enriched."  *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (internal quotation marks omitted).  Disgorgement is designed to "strip wrongdoers of their ill-gotten gains," but it is not meant to be used as a "punitive sanction."  *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).  "The Court has broad discretion in calculating the amount defendants should pay in disgorgement."  *SEC v. Rir fret*, No. 19 Civ. 6037, 2020 WL 6559411, at *5 (S.D.N.Y. Nov. 9, 2020).  However, as noted above, because disgorgement is not meant to serve a punitive

SPA19

function, "the disgorgement amount may not exceed the amount obtained through the wrongdoing." *SEC v. Wyly*, 56 F. Supp. 3d 394, 403 (S.D.N.Y. 2014).

The SEC argues that the Court should order Govil to disgorge an additional $7,335,000. (*See* Dkt. No. 15 at 7–12.)  This is the amount the parties stipulated was transferred to Govil's personal bank account and is the "total proceeds of the fraudulent offerings less the amount of the offering expenses and the amount that remained with the issuer for corporate expenses." (Dkt. No. 15 at 8.)  The SEC plans to distribute these disgorged funds to harmed investors, who, according to the SEC, are readily identifiable.  (Dkt. No. 15 at 8–9.)  Govil counters that if the Court decides that additional disgorgement is warranted, the amount should be reduced by the amount Govil agreed to pay under the Settlement Agreement, resulting in an additional disgorgement of only $235,000.  (Dkt. No. 18 at 10.)

The SEC first argues that the disgorgement should not be reduced by $7.1 million because the payments via the Settlement Agreement were "personal in nature" and should not be treated as business expenses that can be deducted from the disgorgement.  (Dkt. No. 15 at 10–11.)  In *Liu*, the Supreme Court held that equitable disgorgement must be limited to the ill-gotten gains by the wrongdoer, or "the gains made upon any business or investment, when both the receipts and payments are taken into account."  140 S. Ct. at 1949–50 (internal quotation marks omitted).  The Court also recognized that "expenses" may be "wrongful gains under another name."  *Id.* at 1950 (internal quotation marks).  For instance, in a D.C. Circuit decision following *Liu*, the court concluded that the continuing-education expenses paid for by misallocated funds was appropriate for disgorgement.  *Springsteen-Abbott v. SEC*, 989 F.3d 4, 9 (D.C. Cir. 2021).  As an initial matter, the Court disagrees with the SEC's characterization that the Settlement Agreement was strictly "personal in nature" simply because Cemtrex released Govil from

liability in exchange for the repayment of $7.1 million. More to the point, however, is that this argument misses the relevant question, which is whether Govil's surrendering of stock and promise of additional payment *to* Cemtrex rights the wrongs to the actual victim of his misconduct. After all, if Cemtrex is the victim, then the Settlement Agreement would have properly "pa[id] . . . a fair compensation to the person wronged," *Tilghman v. Proctor*, 125 U.S. 136, 146 (1888), and requiring additional disgorgement would then serve as an improper punitive measure. Thus, the issue is whether the Settlement Agreement should be considered as a form of disgorgement itself.

This brings us to the crux of the issue between the parties. The SEC contends that the investors in the notes offerings and the rights offerings are the victims of Govil's misconduct, and they, not Cemtrex, should receive repayment. (Dkt. No. 15 at 9–10.) Govil, in contrast, argues that the Complaint "allege[s] a classic executive misappropriation scheme . . . and which specifically identif[ies] Cemtrex as the victim of Govil's alleged misconduct." (Dkt. No. 18 at 15–16.)

The Court agrees with the SEC that the investors are victims of Govil's misconduct. They were promised that the proceeds of the offerings "would be used for various corporate purposes, including new product development and acquisitions, as well as repaying outstanding debt and other general corporate purposes." (Compl. ¶ 25.) But this was a lie. Govil instead transferred $7.335 million into his own bank account and used those funds to pay for personal expenses and other ventures unrelated to Cemtrex. (Compl. ¶ 28.) Thus, while Govil had represented to the investors that their offerings proceeds would be used for corporate purposes, ostensibly in order to secure their investments, they were in fact misappropriated by Govil for personal purposes. It can hardly be said that an individual who invests in a company because he

believes his investments are being used to help that company, but whose investment is then used to pay for unrelated expenses, is not the victim of said scheme.

Having concluded that the investors are the real victims of Govil's misconduct does not, however, end the inquiry. The Court must still consider whether the Settlement Agreement serves as a sufficient equitable remedy. On the one hand, the Court concludes that Govil's surrender of his stock — valued at $5,566,720 — should not be deducted from the $7,335,000 disgorgement request. As the SEC notes, after transferring his control stock to Cemtrex, Govil's son obtained sole voting control over the company, Govil was released from liability, and Cemtrex shareholders received nothing. (Dkt. No. 21 at 4.) Only Govil and his son benefitted from Govil's surrender of stock, a result that runs counter to the purposes of disgorgement.

On the other hand, the Court agrees with Govil that the amount of the promissory note, assuming it is paid to Cemtrex by February 26, 2023, should be deducted. The promise to the investors was that their offering proceeds would be used for Cemtrex expenses. As the funds from the promissory note will presumably be placed in the company's account and used for corporate expenses, the original promise to the purchasers of the offerings will, in fact, be realized. Thus, this payment is similar to those contemplated in *SEC v. First Jersey Secs., Inc.*, where the Second Circuit held that district courts have the discretion to reduce disgorgement for settlements paid to victims. 101 F.3d 1450, 1475 (2d Cir. 1996). The Court will exercise its discretion in reducing the disgorgement amount by the amount of the promissory note.

The Court therefore concludes that disgorgement in the amount of $5,801,720 is appropriate here.[1] The SEC has represented that it is feasible to identify the victims of the fraud.

---

[1] Because the Court concludes that disgorgement in the amount of $5,801,720 is appropriate, it declines to address the SEC's argument that the valuation of the preferred stock is not credible. (Dkt. No. 15 at 10–11.)



However, if it later determines that distribution to investors is infeasible, it must update the Court to permit consideration of whether directing such proceeds to the Treasury is permissible. *See SEC v. Penn*, No. 14 Civ. 581, 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31, 2021).

**B.      Prejudgment Interest of $1,320,654.29**

The SEC also requests that the Court direct Govil to pay prejudgment interest on the amount of disgorgement.  "Awarding prejudgment interest, like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws . . . . Because a defendant has use of the unlawful profits from the time of the wrongdoing until entry of judgment, prejudgment interest is necessary to capture the full measure of the defendant's ill-gotten gains." *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Because the Court concludes that disgorgement in the amount of $5,801,720 is appropriate, the SEC is directed to recalculate the prejudgment interest accordingly and submit a letter within a month after the issuance of this Opinion and Order informing the Court of the revised amount.

**C.      Additional Civil Penalties**

Finally, the SEC requests that the Court order an additional civil penalty of $16,056,870 against Govil, pursuant to the Securities Act, 15 U.S.C. § 72t(d)(2)(A)–(C), and the Exchange Act, 15 U.S.C. § 78u(d)(3)(B)(i)–(iii).  (Dkt. No. 15 at 13–17.)  This amount is equal to the gross pecuniary gain of the offering frauds charged in Count I, inclusive of the offering proceeds that Govil did not misappropriate.  (Dkt. No. 15 at 13.)  The SEC argues that an additional penalty equal to the gross pecuniary gain is warranted here because Govil's conduct was egregious. (Dkt. No. 15 at 16.)  Govil argues that the $16 million penalty is not authorized by the Securities

Act or the Exchange Act because it exceeds the "gross pecuniary gain to the defendant," (*i.e.*, the $7,335,000 that Govil transferred to his account).  (Dkt. No. 18 at 20–22.)  Govil further contends that if the Court is to impose an additional penalty, one Tier III penalty of $207,183 is appropriate.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the imposition of civil penalties in three tiers.  "Such penalties are designed to deter future violations of the securities laws and thereby further the goals of encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry."  *Universal Express*, 646 F. Supp. 2d at 567 (internal quotation marks omitted).  The Securities Act and Exchange Act outline three tiers of civil penalties depending on the severity of the violation.  "The first tier[] operates whenever any person has violated any provision of [the Acts].  The second tier requires fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and the third tier applies when such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  *SEC v. Bronson*, 246 F. Supp. 3d 956, 977 (S.D.N.Y. 2017).

The imposition and amount of any penalty rest squarely in the discretion of the courts.  *See id.*  In assessing what, if any, penalty to impose, courts typically consider: (1) the egregiousness of the violations; (2) the defendant's scienter; (3) the frequency of the violations; (5) the defendant's refusal to admit to wrongdoing; (5) whether the defendant's conduct result in substantial losses to other persons; (6) the defendant's lack of honesty with authorities; and (7) whether the penalty should be reduced due to the defendant's demonstrated financial situation.  *See SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003).

In light of the foregoing factors, Govil's conduct warrants imposition of a third-tier penalty. On three occasions, Govil caused Cemex to falsely represent to potential investors that any offering proceeds would be used for business expenses, but in fact, used them for his own personal expenses. He therefore repeatedly lied to investors in order to obtain investments he would go on to use for his personal benefit. Moreover, Govil again lied during the SEC investigation, attempting to evade responsibility by falsely claiming that the bank account where $7.3 million had been transferred did not belong to him. (Dkt. No. 15 at 15.) However, on the other side of the equation is the fact that though there was a risk of significant loss, the investors may not have been financially harmed as a result of Govil's misconduct. (*See* Dkt. No. 18 at 16). And the Court must also consider "the extent to which other aspects of the relief and/or judgment issued in this matter will have the desire punitive effect." *Universal Express*, 646 F. Supp. 2d at 568. Govil, an individual defendant, will have to pay over $6 million in disgorgement and prejudgment interest for this count alone and was required under the consent agreement to pay a $620,000 penalty for the other counts. (*See generally* Dkt. No. 7.) These penalties "lessen the responsibility of the fine to provide a retributive and deterrent effect." *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2002 WL 31422602, at *4 (S.D.N.Y. Oct. 29, 2002).

The Court need not determine whether a fine of the total gross pecuniary gain is allowable because in light of these considerations, the Court concludes that a penalty of $621,549 – the combined statutory maximum amount for the three Tier III violations – is appropriate.

## III.   Conclusion

For the foregoing reasons, the SEC's motion for additional remedies is granted in part and denied in part. Within four weeks after the issuance of this Opinion and Order, the SEC

SPA25

shall submit a revised prejudgment interest calculation based on the revised disgorgement amount and a proposed final judgment.

The Clerk of Court is directed to close the motions at Docket Number 14.

SO ORDERED.

Dated: May 24, 2022
New York, New York

J. PAUL OETKEN
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                           **Plaintiff,**

      -against-

**ARON GOVIL,**

                        **Defendant.**

---

**21 Civ. 6150 (JPO)**

**FINAL JUDGMENT**

Per the Court's Opinion and Order entered on May 24, 2022 (Docket Entry # 22); and the Judgment as to Defendant Aron Govil ("Defendant") entered on July 28, 2021 (Docket Entry # 7), which is adopted and incorporated herein, but is effective as of the date of its original entry; Final Judgment is hereby entered against Defendant as follows:

**I.**

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $5,801,720, prejudgment interst thereon of $1,044,589.87 and a civil penalty in the amount of $621,549.  Defendant shall satisfy this obligation by paying $7,467,858.87 to the Securities and Exchange Commission within 10 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Angelique de Maison as a defendant in this action; and specifying that payment is

made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.  The Commission shall send the funds paid pursuant

to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

interest by moving for civil contempt (and/or through other collection procedures authorized by

law) at any time after 14 days following entry of this Final Judgment.  Defendant shall pay post

judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

## II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the terms, conditions,

relief, and remedies set forth in the Judgment (Docket Entry # 7) shall remain in full force and

effect.

## III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

SPA28

**IV.**

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated:  July 5, 2022



J. PAUL OETKEN
United States District Judge

3



KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78u

§ 78u. Investigations and actions

Effective: January 1, 2021
Currentness

**(a)Authority and discretion of Commission to investigate violations**

**(1)** The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated, or, as to any act or practice, or omission to act, while associated with a member, formerly associated with a member, the rules of a registered clearing agency in which such person is a participant, or, as to any act or practice, or omission to act, while a participant, was a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm, a person associated with such a firm, or, as to any act, practice, or omission to act, while associated with such firm, a person formerly associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, and may require or permit any person to file with it a statement in writing, under oath or otherwise as the Commission shall determine, as to all the facts and circumstances concerning the matter to be investigated. The Commission is authorized in its discretion, to publish information concerning any such violations, and to investigate any facts, conditions, practices, or matters which it may deem necessary or proper to aid in the enforcement of such provisions, in the prescribing of rules and regulations under this chapter, or in securing information to serve as a basis for recommending further legislation concerning the matters to which this chapter relates.

**(2)** On request from a foreign securities authority, the Commission may provide assistance in accordance with this paragraph if the requesting authority states that the requesting authority is conducting an investigation which it deems necessary to determine whether any person has violated, is violating, or is about to violate any laws or rules relating to securities matters that the requesting authority administers or enforces. The Commission may, in its discretion, conduct such investigation as the Commission deems necessary to collect information and evidence pertinent to the request for assistance. Such assistance may be provided without regard to whether the facts stated in the request would also constitute a violation of the laws of the United States. In deciding whether to provide such assistance, the Commission shall consider whether (A) the requesting authority has agreed to provide reciprocal assistance in securities matters to the Commission; and (B) compliance with the request would prejudice the public interest of the United States.

**(b)Attendance of witnesses; production of records**

For the purpose of any such investigation, or any other proceeding under this chapter, any member of the Commission or any officer designated by it is empowered to administer oaths and affirmations, subpena witnesses, compel their attendance, take


evidence, and require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry. Such attendance of witnesses and the production of any such records may be required from any place in the United States or any State at any designated place of hearing.

**(c)Judicial enforcement of investigative power of Commission; refusal to obey subpena; criminal sanctions**

In case of contumacy by, or refusal to obey a subpena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records. And such court may issue an order requiring such person to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served in the judicial district whereof such person is an inhabitant or wherever he may be found. Any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, and other records, if in his power so to do, in obedience to the subpena of the Commission, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year, or both.

**(d)Injunction proceedings; authority of court to prohibit persons from serving as officers and directors; money penalties in civil actions**

**(1)** Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, it may in its discretion bring an action in the proper district court of the United States, the United States District Court for the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices as may constitute a violation of any provision of this chapter or the rules or regulations thereunder to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter.

**(2) Authority of court to prohibit persons from serving as officers and directors**

In any proceeding under paragraph (1) of this subsection, the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 78j(b) of this title or the rules or regulations thereunder from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78*l* of this title or that is required to file reports pursuant to section 78*o*(d) of this title if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

**(3)Civil money penalties and authority to seek disgorgement**

**(A)Authority of Commission**

SPA31

Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder, or a cease-and-desist order entered by the Commission pursuant to section 78u-3 of this title, other than by committing a violation subject to a penalty pursuant to section 78u-1 of this title, the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to--

(i) impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation; and

(ii) require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation.

**(B)Amount of penalty**

**(i)First tier**

The amount of a civil penalty imposed under subparagraph (A)(i) shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.

**(ii)Second tier**

Notwithstanding clause (i), the amount of a civil penalty imposed under subparagraph (A)(i) for each such violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

**(iii)Third tier**

Notwithstanding clauses (i) and (ii), the amount of a civil penalty imposed under subparagraph (A)(i) for each violation described in that subparagraph shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if--

(aa) the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

**(C)Procedures for collection**

**(i)Payment of penalty to treasury**

A penalty imposed under this section shall be payable into the Treasury of the United States, except as otherwise provided in section 7246 of this title and section 78u-6 of this title.

**(ii)Collection of penalties**

If a person upon whom such a penalty is imposed shall fail to pay such penalty within the time prescribed in the court's order, the Commission may refer the matter to the Attorney General who shall recover such penalty by action in the appropriate United States district court.

**(iii)Remedy not exclusive**

The actions authorized by this paragraph may be brought in addition to any other action that the Commission or the Attorney General is entitled to bring.

**(iv)Jurisdiction and venue**

For purposes of section 78aa of this title, actions under this paragraph shall be actions to enforce a liability or a duty created by this chapter.

**(D)Special provisions relating to a violation of a cease-and-desist order**

In an action to enforce a cease-and-desist order entered by the Commission pursuant to section 78u-3 of this title, each separate violation of such order shall be a separate offense, except that in the case of a violation through a continuing failure to comply with the order, each day of the failure to comply shall be deemed a separate offense.

**(4) Prohibition of attorneys' fees paid from Commission disgorgement funds**

Except as otherwise ordered by the court upon motion by the Commission, or, in the case of an administrative action, as otherwise ordered by the Commission, funds disgorged under paragraph (7) as the result of an action brought by the Commission in Federal court, or as a result of any Commission administrative action, shall not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds.

**(5) Equitable relief**

In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.

**(6) Authority of a court to prohibit persons from participating in an offering of penny stock**

**(A)In general**

In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

**(B)Definition**

For purposes of this paragraph, the term "person participating in an offering of penny stock" includes any person engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock. The Commission may, by rule or regulation, define such term to include other activities, and may, by rule, regulation, or order, exempt any person or class of persons, in whole or in part, conditionally or unconditionally, from inclusion in such term.

**(7)Disgorgement**

In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.

**(8)Limitations periods**

**(A)Disgorgement**

The Commission may bring a claim for disgorgement under paragraph (7)--

**(i)** not later than 5 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim occurs; or

**(ii)** not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates--

**(I)**section 78j(b) of this title;

**(II)**section 77q(a)(1) of this title;

**(III)**section 80b-6(1) of this title; or

**(IV)** any other provision of the securities laws for which scienter must be established.

**(B)Equitable remedies**

The Commission may seek a claim for any equitable remedy, including for an injunction or for a bar, suspension, or cease and desist order, not later than 10 years after the latest date on which a violation that gives rise to the claim occurs.

SPA34

**(C)Calculation**

For the purposes of calculating any limitations period under this paragraph with respect to an action or claim, any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that period.

**(9)Rule of construction**

Nothing in paragraph (7) may be construed as altering any right that any private party may have to maintain a suit for a violation of this chapter.

**(e)Mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, the rules of the Municipal Securities Rulemaking Board, or any undertaking contained in a registration statement as provided in subsection (d) of section 78*o* of this title, (2) any national securities exchange or registered securities association to enforce compliance by its members and persons associated with its members with the provisions of this chapter, the rules, regulations, and orders thereunder, and the rules of such exchange or association, or (3) any registered clearing agency to enforce compliance by its participants with the provisions of the rules of such clearing agency.

**(f)Rules of self-regulatory organizations or Board**

Notwithstanding any other provision of this chapter, the Commission shall not bring any action pursuant to subsection (d) or (e) of this section against any person for violation of, or to command compliance with, the rules of a self-regulatory organization or the Public Company Accounting Oversight Board unless it appears to the Commission that (1) such self-regulatory organization or the Public Company Accounting Oversight Board is unable or unwilling to take appropriate action against such person in the public interest and for the protection of investors, or (2) such action is otherwise necessary or appropriate in the public interest or for the protection of investors.

**(g)Consolidation of actions; consent of Commission**

Notwithstanding the provisions of section 1407(a) of Title 28, or any other provision of law, no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission.

**(h)Access to records**

**(1)** The Right to Financial Privacy Act of 1978 shall apply with respect to the Commission, except as otherwise provided in this subsection.

**(2)** Notwithstanding section 1105 or 1107 of the Right to Financial Privacy Act of 1978, the Commission may have access to and obtain copies of, or the information contained in financial records of a customer from a financial institution without prior notice to the customer upon an ex parte showing to an appropriate United States district court that the Commission seeks such financial records pursuant to a subpena issued in conformity with the requirements of section 19(b) of the Securities Act of 1933, section 21(b) of the Securities Exchange Act of 1934, section 42(b) of the Investment Company Act of 1940, or section 209(b) of the Investment Advisers Act of 1940, and that the Commission has reason to believe that--

**(A)** delay in obtaining access to such financial records, or the required notice, will result in--

**(i)** flight from prosecution;

**(ii)** destruction of or tampering with evidence;

**(iii)** transfer of assets or records outside the territorial limits of the United States;

**(iv)** improper conversion of investor assets; or

**(v)** impeding the ability of the Commission to identify or trace the source or disposition of funds involved in any securities transaction;

**(B)** such financial records are necessary to identify or trace the record or beneficial ownership interest in any security;

**(C)** the acts, practices or course of conduct under investigation involve--

**(i)** the dissemination of materially false or misleading information concerning any security, issuer, or market, or the failure to make disclosures required under the securities laws, which remain uncorrected; or

**(ii)** a financial loss to investors or other persons protected under the securities laws which remains substantially uncompensated; or

**(D)** the acts, practices or course of conduct under investigation--

**(i)** involve significant financial speculation in securities; or

**(ii)** endanger the stability of any financial or investment intermediary.

SPA36

**(3)** Any application under paragraph (2) for a delay in notice shall be made with reasonable specificity.

**(4)(A)** Upon a showing described in paragraph (2), the presiding judge or magistrate judge shall enter an ex parte order granting the requested delay for a period not to exceed ninety days and an order prohibiting the financial institution involved from disclosing that records have been obtained or that a request for records has been made.

**(B)** Extensions of the period of delay of notice provided in subparagraph (A) of up to ninety days each may be granted by the court upon application, but only in accordance with this subsection or section 1109(a), (b)(1), or (b)(2) of the Right to Financial Privacy Act of 1978.

**(C)** Upon expiration of the period of delay of notification ordered under subparagraph (A) or (B), the customer shall be served with or mailed a copy of the subpena insofar as it applies to the customer together with the following notice which shall describe with reasonable specificity the nature of the investigation for which the Commission sought the financial records:

"Records or information concerning your transactions which are held by the financial institution named in the attached subpena were supplied to the Securities and Exchange Commission on (date). Notification was withheld pursuant to a determination by the (title of court so ordering) under section 21(h) of the Securities Exchange Act of 1934 that (state reason). The purpose of the investigation or official proceeding was (state purpose)."

**(5)** Upon application by the Commission, all proceedings pursuant to paragraphs (2) and (4) shall be held in camera and the records thereof sealed until expiration of the period of delay or such other date as the presiding judge or magistrate judge may permit.

**(6)** Repealed. Pub.L. 114-113, Div. O, Title VII, § 708, Dec. 18, 2015, 129 Stat. 3030

**(7)(A)** Following the expiration of the period of delay of notification ordered by the court pursuant to paragraph (4) of this subsection, the customer may, upon motion, reopen the proceeding in the district court which issued the order. If the presiding judge or magistrate judge finds that the movant is the customer to whom the records obtained by the Commission pertain, and that the Commission has obtained financial records or information contained therein in violation of this subsection, other than paragraph (1), it may order that the customer be granted civil penalties against the Commission in an amount equal to the sum of--

**(i)** $100 without regard to the volume of records involved;

**(ii)** any out-of-pocket damages sustained by the customer as a direct result of the disclosure; and

**(iii)** if the violation is found to have been willful, intentional, and without good faith, such punitive damages as the court may allow, together with the costs of the action and reasonable attorney's fees as determined by the court.

**(B)** Upon a finding that the Commission has obtained financial records or information contained therein in violation of this subsection, other than paragraph (1), the court, in its discretion, may also or in the alternative issue injunctive relief to require

the Commission to comply with this subsection with respect to any subpena which the Commission issues in the future for financial records of such customer for purposes of the same investigation.

**(C)** Whenever the court determines that the Commission has failed to comply with this subsection, other than paragraph (1), and the court finds that the circumstances raise questions of whether an officer or employee of the Commission acted in a willful and intentional manner and without good faith with respect to the violation, the Office of Personnel Management shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the agent or employee who was primarily responsible for the violation. After investigating and considering the evidence submitted, the Office of Personnel Management shall submit its findings and recommendations to the Commission and shall send copies of the findings and recommendations to the officer or employee or his representative. The Commission shall take the corrective action that the Office of Personnel Management recommends.

**(8)** The relief described in paragraphs (7) and (10) shall be the only remedies or sanctions available to a customer for a violation of this subsection, other than paragraph (1), and nothing herein or in the Right to Financial Privacy Act of 1978 shall be deemed to prohibit the use in any investigation or proceeding of financial records, or the information contained therein, obtained by a subpena issued by the Commission. In the case of an unsuccessful action under paragraph (7), the court shall award the costs of the action and attorney's fees to the Commission if the presiding judge or magistrate judge finds that the customer's claims were made in bad faith.

**(9)(A)** The Commission may transfer financial records or the information contained therein to any government authority if the Commission proceeds as a transferring agency in accordance with section 1112 of the Right to Financial Privacy Act of 1978, except that the customer notice required under section 1112(b) or (c) of such Act may be delayed upon a showing by the Commission, in accordance with the procedure set forth in paragraphs (4) and (5), that one or more of subparagraphs (A) through (D) of paragraph (2) apply.

**(B)** The Commission may, without notice to the customer pursuant to section 1112 or the Right to Financial Privacy Act of 1978, transfer financial records or the information contained therein to a State securities agency or to the Department of Justice. Financial records or information transferred by the Commission to the Department of Justice or to a State securities agency pursuant to the provisions of this subparagraph may be disclosed or used only in an administrative, civil, or criminal action or investigation by the Department of Justice or the State securities agency which arises out of or relates to the acts, practices, or courses of conduct investigated by the Commission, except that if the Department of Justice or the State securities agency determines that the information should be disclosed or used for any other purpose, it may do so if it notifies the customer, except as otherwise provided in the Right to Financial Privacy Act of 1978, within 30 days of its determination, or complies with the requirements of section 1109 of such Act regarding delay of notice.

**(10)** Any government authority violating paragraph (9) shall be subject to the procedures and penalties applicable to the Commission under paragraph (7)(A) with respect to a violation by the Commission in obtaining financial records.

**(11)** Notwithstanding the provisions of this subsection, the Commission may obtain financial records from a financial institution or transfer such records in accordance with provisions of the Right to Financial Privacy Act of 1978.

**(12)** Nothing in this subsection shall enlarge or restrict any rights of a financial institution to challenge requests for records made by the Commission under existing law. Nothing in this subsection shall entitle a customer to assert any rights of a financial institution.

**(13)** Unless the context otherwise requires, all terms defined in the Right to Financial Privacy Act of 1978 which are common to this subsection shall have the same meaning as in such Act.

**(i)Information to CFTC**

The Commission shall provide the Commodity Futures Trading Commission with notice of the commencement of any proceeding and a copy of any order entered by the Commission against any broker or dealer registered pursuant to section 78*o*(b)(11) of this title, any exchange registered pursuant to section 78f(g) of this title, or any national securities association registered pursuant to section 78*o*-3(k) of this title.

## CREDIT(S)

   (June 6, 1934, c. 404, Title I, § 21, 48 Stat. 899; May 27, 1936, c. 462, § 7, 49 Stat. 1379; Pub.L. 91-452, Title II, § 212, Oct. 15, 1970, 84 Stat. 929; Pub.L. 94-29, § 17, June 4, 1975, 89 Stat. 154; Pub.L. 96-433, §§ 3, 4, Oct. 10, 1980, 94 Stat. 1855, 1858; Pub.L. 98-376, § 2, Aug. 10, 1984, 98 Stat. 1264; Pub.L. 100-181, Title III, § 323, Dec. 4, 1987, 101 Stat. 1259; Pub.L. 100-704, §§ 3(a)(1), 6(b), Nov. 19, 1988, 102 Stat. 4677, 4681; Pub.L. 101-429, Title II, § 201, Oct. 15, 1990, 104 Stat. 935; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117; Pub.L. 104-67, Title I, § 103(b)(2), Dec. 22, 1995, 109 Stat. 756; Pub.L. 106-554, § 1(a)(5) [Title II, § 205(a)(5)], Dec. 21, 2000, 114 Stat. 2763, 2763A-426; Pub.L. 107-204, § 3(b)(2), Title III, §§ 305(a)(1), (b), 308(d)(1), Title VI, § 603(a), July 30, 2002, 116 Stat. 749, 778, 779, 785, 794; Pub.L. 111-203, Title IX, §§ 923(b)(1), 929F(c), (d), (g)(2), 986(a)(3), July 21, 2010, 124 Stat. 1849, 1854, 1855, 1935; Pub.L. 114-113, Div. O, Title VII, § 708, Dec. 18, 2015, 129 Stat. 3030; Pub.L. 116-283, Div. F, Title LXV, § 6501(a), Jan. 1, 2021, 134 Stat. 4625.)

Notes of Decisions (553)

15 U.S.C.A. § 78u, 15 USCA § 78u
Current through P.L. 117-214. Some statute sections may be more current, see credits for details.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.